UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re MEDTRONIC, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 0:13-cv-01686-JRT-FLN |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) ) | MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION |
| ALL ACTIONS. | ) ) ) | TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES AND APPOINT CLASS COUNSEL |

1021405_1

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................... 1

II.   FACTUAL BACKGROUND ........................................................... 2

III.  ARGUMENT ................................................................................. 5

    A.   The Proposed Class Satisfies Rule 23(a) .................................... 6

        1.   The Proposed Class Is so Numerous that Joinder Is
            Impracticable ...................................................................... 6

        2.   There Are Questions of Law and Fact Common to the Class ............ 7

        3.   Plaintiffs' Claims Are Typical of the Proposed Class ...................... 8

        4.   Plaintiffs Will Fairly and Adequately Protect the Class ................... 9

    B.   The Proposed Class Satisfies Rule 23(b)(3) ................................ 11

        1.   Common Questions of Law and Fact Predominate over
            Individual Questions ....................................................... 11

            a.   Plaintiffs Are Entitled to a Presumption of Reliance
                Under Both *Basic* and *Affiliated Ute* ...................................... 14

            b.   Plaintiffs Are Entitled to a Presumption of Reliance
                Under *Basic*'s Fraud-on-the-Market Theory......................... 15

            c.   Plaintiffs Are Entitled to a Presumption of Reliance
                Pursuant to *Affiliated Ute* ..................................................... 20

        2.   The Event Study Methodology Is Capable of Measuring
            Damages on a Classwide Basis ......................................... 23

        3.   A Class Action Is Superior to Other Available Methods for
            the Efficient Adjudication of This Case ............................ 24

IV.   CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens v. United States,*
  406 U.S. 128 (1972) ................................................................... *passim*

*Alpern v. UtiliCorp United,*
  84 F.3d 1525 (8th Cir. 1996) ........................................................ 8

*Amchem Prods. v. Windsor,*
  521 U.S. 591 (1997) ................................................................ 2, 11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
  __ U.S. __, 133 S. Ct. 1184 (2013) ........................................... *passim*

*Barrie v. InterVoice-Brite, Inc.,*
  2009 U.S. Dist. LEXIS 99253
  (N.D. Tex. Oct. 26, 2009) ............................................................ 17

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ............................................................... *passim*

*Cammer v. Bloom,*
  711 F. Supp. 1264 (D.N.J. 1989) ................................... 15, 16, 17, 18

*City of Ann Arbor Emps' Ret. Sys. v. Sunoco Prods. Co.,*
  270 F.R.D. 247 (D.S.C. 2010) ..................................................... 17

*Comcast Corp. v. Behrend,*
  __U.S.__, 133 S. Ct. 1426 (2013) .......................................... 13, 19

*DeBoer v. Mellon Mortg. Co.,*
  64 F.3d 1171 (8th Cir. 1995) ....................................................... 7

*Erica P. John Fund Inc. v. Halliburton Co.,*
  _U.S._, 131 S. Ct. 2179 (2011) ......................................... 7, 11, 12

*Escott v. Barchris Constr. Corp.,*
  340 F.2d 731 (2d Cir. 1965) ....................................................... 25

*Fogarazzo v. Lehman Bros.,*
  232 F.R.D. 176 (S.D.N.Y. 2005) ................................................. 21

**Page**

*Gaudin v. Saxon Mortg. Servs.*,
297 F.R.D. 417 (N.D. Cal. 2013) ................................................................ 13

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ......................................................................................... 8

*Goodman v. Genworth Fin. Wealth Mgmt.*,
300 F.R.D. 90 (E.D.N.Y. 2014) ................................................................... 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
_U.S._ 134 S. Ct. 2398 (2014) ................................................ 5, 11, 12, 14

*In re Bank of Am. Corp. Sec.*,
281 F.R.D. 134 (S.D.N.Y. 2012) .................................................................. 6

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) ................................................................ 17

*In re Diamond Foods, Inc.*,
295 F.R.D. 240 (N.D. Cal. 2013) ............................................................... 23

*In re DVI Inc. Sec. Litig.*,
639 F.3d 623 (3d Cir. 2011) ................................................................. 15, 23

*In re Dynex Capital Sec. Litig.*,
2011 U.S. Dist. LEXIS 22484
(S.D.N.Y. Mar. 7, 2011) ............................................................................... 16

*In re Enron Corp. Sec.*,
586 F. Supp. 2d 732 (S.D. Tex. 2008) ...................................................... 10

*In re Facebook, Inc.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ....................................................... 22

*In re Facebook, Inc., IPO & Sec. & Derivative Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013) ....................................................... 20

*In re GenesisIntermedia Sec. Litig.*,
232 F.R.D. 321 (D. Minn. 2005) .................................................................. 8

- iii -

**Page**

*In re Heckmann Corp. Sec. Litig.*,
    2013 U.S. Dist. LEXIS 79345
    (D. Del. June 6, 2013) ................................................................................... 23

*In re IKO Roofing Shingle Prods. Liab. Litig.*,
    757 F.3d 599 (7th Cir. 2014) ................................................................. 13, 23

*In re Merck & Co. Sec. Derivative Litig.*,
    2013 U.S. Dist. LEXIS 13511
    (D.N.J. Jan. 30, 2013) ..................................................................................... 9

*In re MetLife Demutualization Litig.*,
    229 F.R.D. 369 (E.D.N.Y. 2005) .................................................................. 21

*In re Neurontin Antitrust Litig.*,
    2011 U.S. Dist. LEXIS 7453
    (D.N.J. Jan. 25, 2011) ................................................................................... 23

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) .................................................................... 25

*In re Pfizer Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ...................................................................... 9

*In re Retek Inc. Sec. Litig.*,
    236 F.R.D. 431 (D. Minn. 2006)........................................................... *passim*

*In re Sadia*,
    269 F.R.D. 298 (S.D.N.Y. 2010) .................................................................. 21

*In re SciMed Sec. Litig.*,
    1993 U.S. Dist. LEXIS 22144,
    (D. Minn. Sept. 29, 1993) ............................................................................... 6

*In re Select Comfort Corp. Sec. Litig.*,
    202 F.R.D. 598 (D. Minn. 2001)........................................................ 11, 24, 25

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) .................................................................... 20

*In re St. Jude Med. Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011) ............................................... 5, 13, 14

**Page**

*In re St. Paul Travelers Sec. Litig. II*,
  2006 U.S. Dist. LEXIS 70261
  (D. Minn. Sept. 25, 2006) ........................................................................ 22

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  2014 U.S. Dist. LEXIS 167802
  (D. Minn. Dec. 2, 2014) ............................................................................ 14

*In re United States Bioscience Sec. Litig.*,
  806 F. Supp. 1197 (E.D. Pa. 1992) ........................................................... 22

*In re Winstar Commc'ns Sec. Litig.*,
  290 F.R.D. 437 (S.D.N.Y. 2013) ................................................................. 6

*In re Xcelera.com Sec. Litig.*,
  430 F.3d 503 (1st Cir. 2005) ..................................................................... 16

*Kennedy v. Tallant*,
  710 F.2d 711 (11th Cir. 1983) .................................................................. 25

*Khoday v. Symantec Corp.*,
  2014 U.S. Dist. LEXIS 43315
  (D. Minn. Mar. 31, 2014) ...................................................................... 7, 8

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ................................................... 17, 18, 19

*Leyva v. Medline Indus.*,
  716 F.3d 510 (9th Cir. 2013) .................................................................... 19

*Lockwood Motors v. Gen. Motors Inc.*,
  162 F.R.D. 569 (D. Minn. 1995) ........................................................... 7, 13

*Lumen v. Anderson*,
  280 F.R.D. 451 (W.D. Mo. 2012) .......................................................... 5, 18

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) .................................................................... 19

*Minneapolis Firefighters' Relief Ass'n v. Medtronic Inc.*,
  278 F.R.D. 454 (D. Minn. 2011) ............................................................... 10

1021405_1

**Page**

*Nguyen v. Radient Pharm. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) ........................................................... 17, 18

*Paxton v. Union Nat'l Bank*,
   688 F.2d 552 (8th Cir. 1982) .................................................................... 9

*Quaak v. Dexia, S.A.*,
   445 F. Supp. 2d 130 (D. Mass. 2006) ...................................................... 22

*Schaaf v. Residential Funding Corp.*,
   517 F.3d 544 (8th Cir. 2008) .................................................................... 14

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) .................................................. 2, 12, 13, 19

*Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008) .................................................................................. 20

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011) ..................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................... 5

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) .................................................................... 18

*United States v. Schiff*,
   602 F.3d 152 (3d Cir. 2010) ..................................................................... 22

*Vervaecke v. Chiles, Heider & Co.*,
   578 F.2d 713 (8th Cir. 1978) .............................................................. 15, 20

*Wal-Mart Stores, Inc. v. Dukes*,
   __U.S.__, 131 S. Ct. 2541 (2011) ........................................................... 5, 7

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78j(b) ......................................................................................................... 1
   §78t(a) ......................................................................................................... 1
   §78u-4(e) ................................................................................................... 13

1021405_1

**Page**

Federal Rules of Civil Procedure

Rule 23 ...................................................................................... 5, 25

Rule 23(a)............................................................................... 1, 6, 11

Rule 23(a)(1) ...................................................................................... 6

Rule 23(a)(2) ...................................................................................... 7

Rule 23(a)(3) ...................................................................................... 8

Rule 23(a)(4) ...................................................................................... 9

Rule 23(b)(3).............................................................................. *passim*

Rule 23(g) .......................................................................................... 1

17 C.F.R.

§239.13 ............................................................................................ 18

§240.10b-5(b)................................................................................... 14

## I.      INTRODUCTION

Plaintiffs hereby move the Court for an order certifying this case as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following proposed class of investors (the "Class"):

> All persons or entities who purchased or otherwise acquired the publicly traded common stock of Medtronic between September 8, 2010 and August 3, 2011 (the "Class Period"), and who were damaged by defendants'[1] alleged violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

Plaintiffs also move the Court for an order appointing Employees' Retirement System of the State of Hawaii ("Hawaii ERS"), West Virginia Pipe Trades Health & Welfare Fund ("Health & Welfare Fund") and Union Asset Management Holding AG ("UAM") as representatives of the Class and appointing Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Motley Rice LLC ("Motley Rice") as Co-Lead Class Counsel for the Class pursuant to Fed. R. Civ. P. 23(g).

As detailed herein, this case meets the requirements of numerosity, typicality, commonality and adequacy.  Fed. R. Civ. P. 23(a).  In addition, the case presents common questions of law and fact that predominate over any individual questions.  Fed. R. Civ. P. 23(b)(3).  Finally, a class action is superior to any other methods of litigating the claims asserted.  *Id.*

---

[1]     Defendants are Medtronic and "Individual Defendants" William A. Hawkins ("Hawkins"), Gary L. Ellis ("Ellis"), Richard E. Kuntz ("Kuntz"), Julie Bearcroft ("Bearcroft"), Richard W. Treharne ("Treharne") and Martin Yahiro ("Yahiro") collectively "defendants").

- 1 -

Courts have long recognized that securities fraud actions such as this one are ideally suited for class certification due to the predominance of common issues of law and fact and the impracticability of bringing individual actions to redress a common wrong. *E.g.*, *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997) (recognizing that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud"). *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010).[2]

Here, the Class includes thousands of investors who, like plaintiffs, purchased Medtronic common stock during the Class Period at artificially inflated prices and suffered economic loss when the Company's true financial condition was revealed. ¶¶138-144.[3] Because the market for Medtronic common stock, which trades on the New York Stock Exchange ("NYSE"), was efficient, and because Medtronic's undisclosed scheme to defraud and false and misleading statements or omissions were material to investors, Class members are entitled to a presumption of reliance pursuant to both *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) and *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972).

## II.   FACTUAL BACKGROUND

INFUSE is the trade name of rhBMP-2, a bone morphogenetic protein ("BMP") that induces the body to develop new bone tissue. ¶7. INFUSE is approved by the United States Food and Drug Administration ("FDA") for the treatment of degenerative disc disease only in single-level spine fusions in the lower back using an anterior surgical approach. Before

---

[2]   All internal citations and footnotes omitted and emphasis added unless otherwise noted.

[3]   All "¶_" and "¶¶__" references are to the Consolidated Class Action Complaint for Violation of the Federal Securities Laws (Dkt. No. 28) ("Complaint"), unless otherwise noted.

INFUSE's approval, Medtronic had set a corporate goal for INFUSE to replace ICBG as the standard of care in spinal fusions. *Id.* To achieve that goal – and thereby drive sales of INFUSE – Medtronic needed clinical studies to establish its safety and efficacy. *Id.*

Unbeknownst to investors, throughout the Class Period – and in fact dating back to at least 2000 – defendants engaged in a fraudulent scheme and course of conduct by withholding evidence obtained from clinical studies and editing medical articles to downplay or conceal the risks associated with rhBMP-2, thereby increasing confidence in the product and driving sales. ¶¶87, 124-129. As part of the scheme, defendants surreptitiously drafted and edited medical journal articles that purportedly had been written by physician consultants and excised facts from clinical trials regarding the efficacy and side effects of INFUSE. *See* ¶¶17, 35, 87, 105, 107, 125, 127, 129. Defendants also edited clinical trial reports to grossly overstate the disadvantages of ICBG in order to make INFUSE appear to be a more desirable alternative. ¶¶87, 107. Indeed, the rhBMP-2 studies had been systematically designed to bias the results in favor of INFUSE with respect to both adverse events and efficacy. ¶¶87, 108. In furtherance of the scheme, Medtronic paid the purported authors of the INFUSE articles – physicians who consulted for the Company – over $210 million between 1996 and 2010. ¶¶87, 106, 125.

On May 25, 2011, *The Spine Journal* published a study highlighting the risk of retrograde ejaculation ("RE") (which causes male sterility) in patients treated with INFUSE. ¶¶26, 89. The article, based upon a retrospective analysis of INFUSE patients over a three-year period, revealed that there was a ***twelvefold increase*** in RE among INFUSE users. *Id.*

- 3 -

On June 28, 2011, *The Spine Journal* devoted an entire issue to INFUSE in which the authors further detailed the risks and side effects associated with INFUSE, revealing that the incidence of adverse events among INFUSE users was ***many times greater*** than what had been disclosed in the original publications, up to as high as ***50%***.  ¶¶30, 103-104.  Perhaps most significantly, the article titled "Folly of FDA-Approval Studies for Bone Morphogenetic Protein" detailed how early INFUSE trials, funded by Medtronic and conducted by its highly-paid consultants, were systematically designed to elicit results favorable to INFUSE.  ¶108.  The median range of financial incentives was ***$12 to $16 million per study***.  ¶¶30, 106.

On October 25, 2012, after gathering and reviewing internal documents provided to it by Medtronic, the U.S. Senate Committee on Finance issued a report in October 2012 ("Senate Staff Report") concerning the Company's influence over INFUSE clinical trials. ¶125.  The Senate Staff Report revealed Medtronic's material (and previously undisclosed) role in shaping the medical literature purporting to establish INFUSE's safety and efficacy, including that:

- Medtronic was heavily involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants and covertly participated in the peer review process.  ¶¶125, 129.

- ***Medtronic officials inserted language into studies that promoted INFUSE*** as a better technique than taking a bone graft from the pelvic bone (autograft technique) by emphasizing the pain of the autograft technique.  ¶125.

As a result of the disclosure of the relevant truth, which had been concealed by defendants' fraud, Medtronic's stock declined, causing significant economic loss.  ¶¶137-145.

- 4 -

## III.   ARGUMENT

Meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *Basic*, 485 U.S. at 229-31.  Courts in this Circuit and District have frequently certified class actions in securities cases to provide opportunities for redress to injured investors.  *See, e.g.*, *In re St. Jude Med. Inc. Sec. Litig.*, 836 F. Supp. 2d 878 (D. Minn. 2011); *Lumen v. Anderson*, 280 F.R.D. 451 (W.D. Mo. 2012); *In re Retek Inc. Sec. Litig.*, 236 F.R.D. 431 (D. Minn. 2006).

While the Rule 23 analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Id*. at 1194-95 (quoting *Wal-Mart Stores, Inc. v. Dukes*, __U.S.__, 131 S. Ct. 2541, 2551-52 (2011)).  Therefore, the elements of a securities fraud claim – falsity, materiality, scienter and loss causation – are not properly resolved as part of the class certification analysis and should be decided at the merits stage. *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, __ U.S. __, 133 S. Ct. 1184, 1200 (2013); *Halliburton Co. v. Erica P. John Fund, Inc.*, _U.S._ 134 S. Ct. 2398, 2416 (2014) ("*Halliburton II*") ("because materiality is a discrete issue that can be resolved in isolation from the other [class certification] prerequisites, it can be wholly confined to the merits stage"); *id*. at 2406 ("securities fraud plaintiffs [need not] prove 'loss causation' – a causal connection between the defendants' alleged misrepresentations and the plaintiffs' economic losses – in order to . . . obtain class certification").

- 5 -

## A.     The Proposed Class Satisfies Rule 23(a)

A party seeking class certification must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  Each of these prerequisites is satisfied here.

### 1.     The Proposed Class Is so Numerous that Joinder Is Impracticable

In securities fraud class actions relating to publicly owned and actively listed corporations, Fed. R. Civ. P. 23(a)(1) numerosity may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.  *In re Bank of Am. Corp. Sec.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013) (numerosity satisfied where 85 million shares of *Winstar* common stock traded on NASDAQ and 610 shareholders of record).  In fact, "[c]ourts generally assume the numerosity requirement is satisfied in class actions involving nationally traded securities."  *In re SciMed Sec. Litig.*, 1993 U.S. Dist. LEXIS 22144, 1993 WL 616692, at *3 (D. Minn. Sept. 29, 1993).

During the Class Period, Medtronic had over one billion shares of stock outstanding, owned by hundreds, if not thousands, of persons and traded on the NYSE.  Feinstein Decl., ¶¶51 n.13, 73.[4]  District courts in the Eighth Circuit have certified classes consisting of as

---

[4]     *See* Declaration of Shawn A. Williams in Support of Lead Plaintiffs' Motion to Certify Class, Appoint Class Representatives and Appoint Class Counsel ("Williams Decl."), Declaration of Brian P. Aburano in Support of Plaintiffs' Motion to Certify Class, Appoint Class Representatives and Appoint Class Counsel ("Aburano Decl."), Declaration of Louie

few as 40 members. *Lockwood Motors v. Gen. Motors Inc.*, 162 F.R.D. 569, 574 (D. Minn. 1995). At all times relevant hereto, Medtronic shares were traded on the NYSE. Dkt. No. 85, ¶2. During the Class Period, an average of 6.5 million shares traded hands daily. Feinstein Decl., ¶43. More than 1,187 institutions owned Medtronic common stock during the Class Period. *Id.* ¶51. Numerosity is satisfied.

### 2.    There Are Questions of Law and Fact Common to the Class

Rule 23(a)(2) requires that "'"there are questions of law or fact common to the class."'" *Khoday v. Symantec Corp.*, 2014 U.S. Dist. LEXIS 43315, at *41 (D. Minn. Mar. 31, 2014). Importantly, "courts have found that the threshold for commonality is low." *Id.*; *see also DeBoer v. Mellon Mortg. Co*., 64 F.3d 1171, 1174 (8th Cir. 1995) (commonality requires only that the legal issue "'"linking the class members is substantially related to the resolution of the litigation"'"). As the Supreme Court recently explained, class "claims must depend upon a common contention of such a nature that it is capable of classwide resolution." *Wal-Mart*, 131 S. Ct. at 2545 (2011). Indeed, "'"[e]ven a single [common] question'" will do." *Id.* (alterations in original).

Here, each of the Class members' claims regarding defendants' scheme to defraud and false and misleading statements or omission will be decided together based on common evidence. *Amgen*, 133 S. Ct. at 1198; *Erica P. John Fund Inc. v. Halliburton Co.*, _U.S._, 131 S. Ct. 2179, 2185 (2011) ("*Halliburton I*"); *Basic*, 485 U.S. at 248. Indeed, every, or

---

Michael Romine in Support of Plaintiffs' Motion to Certify Class, Appoint Class Representatives and Appoint Class Counsel ("Romine Decl.") and Declaration of Steven P. Feinstein, Ph.D., CFA ("Feinstein Decl.").

almost every, issue to be decided in the case will be based on identical claims and common evidence, including:

- Whether defendants engaged in a scheme to defraud;

- Whether defendants knowingly and recklessly made false and misleading statements or omissions;

- Whether the price of Medtronic common stock was artificially inflated; and

- The extent of damages sustained by Class members and the appropriate measure of damages.

*See, e.g.*, ¶152.

The commonality requirement is easily satisfied. *See In re GenesisIntermedia Sec. Litig.*, 232 F.R.D. 321, 328 (D. Minn. 2005) (commonality satisfied where common legal theory – violation of the federal securities laws – is linked to a common group: purchasers of defendants' securities).

### 3.    Plaintiffs' Claims Are Typical of the Proposed Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  The typicality requirement seeks to determine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).  The burden plaintiffs must meet to show typicality is "minimal," and factual variations amongst plaintiffs will not preclude class certification "if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United*, 84 F.3d 1525, 1540 (8th Cir. 1996); *Khoday*, 2014 U.S. Dist. LEXIS 43315, at *44.  Therefore,

minor factual differences, such as a class representative's use of investment advisors for stock purchases, cannot defeat typicality where a claim arises from the same events or course of conduct. *In re Merck & Co. Sec. Derivative Litig.*, No. 1658 (SRC), 2013 U.S. Dist. LEXIS 13511, at *44-*45 (D.N.J. Jan. 30, 2013); *In re Pfizer Sec. Litig.*, 282 F.R.D. 38, 45 (S.D.N.Y. 2012) (delegation of trading authority to investment advisor does not render plaintiff atypical).

Here, plaintiffs' claims arise from the same events, misstatements and fraudulent course of conduct that give rise to claims of other Class members; the claims asserted are identical and based on the same legal theory. ¶¶150-156. Plaintiffs, like the other Class members, purchased Medtronic common stock during the Class Period at artificially inflated prices and suffered damages when the relevant truth, concealed by defendants' scheme to defraud and false and misleading statements or omissions was disclosed to the market, causing Medtronic's stock price to decline. Typicality is satisfied.

### 4. Plaintiffs Will Fairly and Adequately Protect the Class

Plaintiffs also meet the Rule 23(a)(4) requirement that "the representative parties will fairly and adequately protect the interests of the class." The focus of the Rule 23(a)(4) inquiry is twofold: (a) whether the Class representatives have common interests with the members of the class; and (b) whether the Class representatives will vigorously prosecute the interests of the Class through qualified counsel. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982); *Retek*, 236 F.R.D. at 435.

Plaintiffs have already demonstrated their commitment to the prosecution of this action and will continue to vigorously prosecute this action. Plaintiffs have aggressively

- 9 -

pursued the claims alleged by ensuring their counsel diligently.   Plaintiffs also fully understand their responsibility as fiduciaries on behalf of absent Class members and have committed to continuing to represent the Class effectively and vigorously.  Aburano Decl., ¶¶3-5; Romine Decl., ¶¶3-5.  Moreover, their adequacy as Class Representatives is further demonstrated by their retention of Robbins Geller and Motley Rice as Class Counsel. Robbins Geller is a highly respected law firm with widely recognized expertise in prosecuting securities class actions, having obtained the largest-ever securities class action recovery (*In re Enron Corp. Sec.*, 586 F. Supp. 2d 732, 740 (S.D. Tex. 2008) ($7.3 billion)); the largest-ever antitrust class action recovery (*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG) (JO) (E.D.N.Y.) ($5.7 billion)); and the largest-ever securities class action jury verdict (*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893 (N.D. Ill. May 7, 2009) ($2.46 billion)).   Williams Decl., Ex. 1 at 2, 10, 23.   Notably, Robbins Geller also prosecuted and secured the largest-ever recovery in a securities class action in connection with options backdating here in this District.  Williams Decl., Ex. 1 at 22-23 (*In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (JMR/FLN) (D. Minn.) ($925 million).[5]

Similarly, Motley Rice is a highly respected law firm with expertise in prosecuting securities class actions.  During the last two years, Motley Rice has recovered, among other

---

[5]   Class Counsel have prosecuted additional securities class actions in this district resulting in millions of dollars in recoveries for investors.  *See, e.g.*, *In re St. Jude Med., Inc. Sec. Litig.*, No. 0:10-cv-00851-SRN-TNL (D. Minn. 2010) ($50 million recovery) (approval pending); *Minneapolis Firefighters' Relief Ass'n v. Medtronic Inc.*, 278 F.R.D. 454, 457 (D. Minn. 2011) ($85 million recovery).

results, $131 million for investors in *Bennett v. Sprint Nextel Corp.*, No. 09-cv-02122-EFM-KMH (D. Kan.) (pending final approval); $60 million in *City of Sterling Heights Gen. Emps' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332 (N.D. Ill.); and $57 million in *In re Hewlett-Packard Co. Sec. Litig.*, No. 11-cv-01404-AG (RNBx) (C.D. Cal.). Williams Decl., Ex. 2.

Plaintiffs, Robbins Geller and Motley Rice will adequately represent the Class.

### B.     The Proposed Class Satisfies Rule 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), this case also satisfies Rule 23(b)(3), which requires that the proposed class representative establish that common questions of law or fact "predominate" over individual issues and that a class action is "superior" to other available methods of adjudication. *See Halliburton I*, 131 S. Ct. at 2184; *Halliburton II*, 131 S. Ct. at 2412.

### 1.     Common Questions of Law and Fact Predominate over Individual Questions

As the Supreme Court has indicated, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem,* 521 U.S. at 625. This is so because "the predominance inquiry is directed toward the issue of liability" and "'if the liability issue is common to the class, common questions are held to predominate over individual questions.'" *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 610 (D. Minn. 2001). Importantly, Rule 23(b)(3) "does ***not*** require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof,'" just "that common questions '***predominate*** over any questions affecting only

- 11 -

individual [class] members.'"  *Amgen*, 133 S. Ct. at 1196 (emphasis and alterations in original).

For class certification purposes, the Supreme Court has clearly found, and recently reiterated, that falsity, materiality and loss causation are common issues to a class because "failure of proof" of any of these elements "would end the case" for all putative class members. *Amgen*, 133 S. Ct. at 1195-96 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)") (alterations in original); *Halliburton I*, 131 S. Ct. at 2186 (plaintiffs are not required to "show loss causation as a condition of obtaining class certification"); *Halliburton II*, 1344 S. Ct. at 2416-17.

Here, it is beyond any reasonable dispute that the questions of law and fact common to all class members include: (i) whether defendants engaged in a scheme to defraud and intentionally or recklessly made materially false and misleading statements and omissions; and (ii) whether this scheme and materially false and misleading statements and omissions caused damages to members of the Class.  As in most securities fraud class action cases, the answer to each of these questions will be tried and proven by common evidence because defendants' alleged misconduct affected all class members in the same manner, *i.e.*, defendants' scheme to defraud false and misleading statements and omissions artificially inflated the price of Medtronic common stock.  *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011) ("[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."); *see also Schleicher*, 618 F.3d at 682 ("Because each investor's loss usually can be established mechanically, common questions predominate

- 12 -

and class certification is routine, if a suitable representative steps forward."); *Lockwood*, 162 F.R.D. at 580.

Once these common questions are resolved, little will remain other than the mechanical act of computing the amount of damages suffered by each class member. Unlike other types of class actions which lack a mandatory statutory scheme, the Private Securities Litigation Reform Act of 1995 expressly provides the formulaic "common methodology" by which all class members' damages must be calculated in securities case such as this. *See* 15 U.S.C. §78u-4(e); *cf. St. Jude*, 2014 U.S. Dist. LEXIS 169354, at *23-*26 (denying defendants' motion to decertify class based upon *Comcast* because "damages may be calculated on a class-wide basis" despite defendants' disagreement with plaintiffs' expert's "methodology" to calculate damages, which was a jury question). Indeed, "'Courts in every circuit have . . . uniformly held that the [Rule] 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.'" *Gaudin v. Saxon Mortg. Servs.*, 297 F.R.D. 417, 429 (N.D. Cal. 2013) (quoting 2 *Newberg on Class Actions* §4:54 (5th ed.)) (some alterations in original); *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 603 (7th Cir. 2014) (commonality of damages is not a prerequisite to class certification); *Schleicher*, 618 F.3d at 682 ("Because each investor's loss usually can be established mechanically, common questions predominate and class certification is routine, if a suitable representative steps forward."). Accordingly, while the magnitude of damage may vary from investor-to-investor, the statutory methodology used to compute those damages is common and thus predominates.

- 13 -

Finally, as to the reliance (or causation) element, all questions are again common and thus predominate because plaintiffs and the Class are entitled to the presumptions of reliance set forth in *Affiliated Ute*, 406 U.S. 128 and *Basic*, 485 U.S. 224.

> ### a.      Plaintiffs Are Entitled to a Presumption of Reliance Under Both *Basic* and *Affiliated Ute*

In an action involving false and misleading statements under Rule 10b-5(b), courts look to the fraud-on-the-market presumption articulated by the Supreme Court in *Basic* and most recently reaffirmed in *Halliburton II*, 134 S. Ct. at 2407-08; *see also Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 552 (8th Cir. 2008) ("the courts presume transaction causation when an investor buys or sells stock at a price set by a liquid market in reliance on the integrity of that price") (citing *Basic*, 485 U.S. at 247); *St. Jude*, 2014 U.S. Dist. LEXIS 169354, at *18 n.4 (noting that in *Halliburton II* the Supreme Court declined to eliminate or modify the availability of the fraud-on-the-market presumption).

In an action involving material omissions, plaintiffs can rely on the *Affiliated Ute* presumption.  *In re Target Corp. Customer Data Sec. Breach Litig.*, 2014 U.S. Dist. LEXIS 167802, at *16 (D. Minn. Dec. 2, 2014) ("A plaintiff raising a securities fraud-by-omission claim need not plead or prove reliance if the omitted information is material – reliance on that material information is presumed") (citing *Affiliated Ute*, 406 U.S. at 153-54) ("All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.").  *Affiliated Ute*, 406 U.S. at 153-54.  When a plaintiff alleges a scheme to defraud under 10b-5(a) and (c), both the *Basic* and *Affiliated Ute* presumptions are available, and the application of one or the

- 14 -

other depends on the "thrust" of the action. *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 716-18 (8th Cir. 1978); *see also Goodman v. Genworth Fin. Wealth Mgmt.*, 300 F.R.D. 90, 104 (E.D.N.Y. 2014) (application of *Basic* or *Affiliated Ute* depends on "the crux of plaintiffs' claims").

Here, plaintiffs have established that they are entitled to a presumption of reliance.

### b.   Plaintiffs Are Entitled to a Presumption of Reliance Under *Basic*'s Fraud-on-the-Market Theory

"The fraud-on-the-market theory rests on the premise that certain well developed markets are efficient processors of public information. In such markets, the 'market price of shares' will 'reflec[t] all publicly available information.'" *Amgen*, 133 S. Ct. at 1192 (quoting *Basic*, 485 U.S. at 246) (alterations in original).

It cannot be credibly disputed that Medtronic traded in an open and efficient market. Feinstein Decl., ¶126. First, Medtronic was widely traded on the NYSE before, during and after the Class Period. *Id.*, ¶¶55-59. Securities traded on national secondary markets like the NYSE are well suited for the application of the fraud-on-the-market theory, and efficiency is generally presumed for stocks traded on the NYSE. *Id.*; *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) (the NYSE is "'developed and efficient for virtually all the securities traded there'"); *In re DVI Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) (listing "on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency"). Indeed, the *Cammer* court identified five factors that have been widely adopted as indicia of market efficiency: (i) average trading volume; (ii) analyst coverage; (iii) the number of market makers; (iv) eligibility to file S-3 Registration Statements; and,

- 15 -

most importantly, (v) the reaction of the stock price to unexpected news. *Retek*, 236 F.R.D. at 436 (citing *Cammer*, 711 F. Supp. at 1286-87). Each of these factors indicates that the market for Medtronic common stock was efficient:

(a)   Average Trading Volume:

The first *Cammer* factor to be considered is average trading volume. An average weekly trading volume that exceeds 2% of the total outstanding shares of a company is recognized as an important indicator of an efficient market. *Cammer*, 711 F. Supp. at 1293. During the Class Period, the average weekly trading volume in Medtronic common stock was 32.4 million shares, approximately 3.0% of the total shares outstanding. Feinstein Decl., ¶44. Thus, Medtronic common stock exceeds the benchmark commonly used by courts as an indication that trading transpired in an efficient market. *In re Dynex Capital Sec. Litig.*, 2011 U.S. Dist. LEXIS 22484, at *12 (S.D.N.Y. Mar. 7, 2011) ("There is a substantial presumption of market efficiency where 1% of the average outstanding balance is traded, *i.e.* a 1% weekly turnover rate."); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514 (1st Cir. 2005) (finding "average daily trading volume represented more than 4% of approximately 27.5 million total outstanding shares – well above the 1% or 2% figures suggested by several courts as the benchmark for supporting a presumption of efficiency"); *see also Cammer*, 711 F. Supp. at 1286, 1293 ("Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.").

(b)   <u>Analyst Coverage</u>:

The second factor to consider is the breadth of analyst coverage. Significant industry analyst coverage supports a finding of market efficiency because it demonstrates that the security in question is closely reviewed by investment professionals who make buy or sell recommendations to investors. *Krogman v. Sterritt*, 202 F.R.D. 467, 475 (N.D. Tex. 2001); *Cammer*, 711 F. Supp. at 1286. Here, 31 separate research firms followed Medtronic common stock during the Class Period and accordingly issued numerous research reports and morning notes. Feinstein Decl., ¶¶47-49; *see City of Ann Arbor Emps' Ret. Sys. v. Sunoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (coverage by six analysts sufficient); *Barrie v. InterVoice-Brite, Inc.*, 2009 U.S. Dist. LEXIS 99253, at *28-*29 (N.D. Tex. Oct. 26, 2009) (12 analysts sufficient).

(c)   <u>Market Makers</u>:

The third factor is the number of market makers. Market makers "'help[] establish a market for securities by reporting bid-and-ask[] quotations . . . and . . . stand[] ready to buy or sell at these publicly quoted prices.'" *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-14 (C.D. Cal. 2009). Here, Medtronic common stock was traded on the NYSE, which uses designated market makers to maintain orderly trading and match bids and offers, enabling investors to trade continually during market hours. Feinstein Decl., ¶¶55-59; *Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Cal. 2012) (finding stock trading on NYSE through designated market makers sufficient to support market efficiency).

(d)     Eligibility to File S-3 Registration Statement:

The fourth factor is the company's eligibility to file an S-3 Registration Statement. The SEC only permits the use of an S-3 short form Registration Statement by issuers whose securities are presumed to be actively traded and widely followed, as demonstrated by a history of making the required SEC filings and a market capitalization of more than $75 million. 17 C.F.R. §239.13. Here, Medtronic's market capitalization during the Class Period averaged $40.2 billion. Feinstein Decl., ¶69.

(e)     Price Reaction to New Material Information:

The next factor to be considered is the reaction of the stock price to new material information. Evidence that the price of a security regularly reacts to unexpected corporate events or financial releases about the issuer is strong evidence of an efficient market. *See, e.g.*, *Cammer*, 711 F. Supp. at 1287; *Radient Pharm.*, 287 F.R.D. at 574. In an efficient market, a stock's price remains relatively stable in the absence of news, and changes rapidly as the market receives new and unexpected information. *Krogman*, 202 F.R.D. at 477. Here, the event study test conducted by Feinstein demonstrates without any reasonable doubt that Medtronic's stock reacted rapidly to new and unexpected information. Feinstein Decl., ¶¶80-156.

In addition to the *Cammer* factors, courts sometimes consider other factors, including the company's market capitalization, the bid-ask spread and the stock's float. *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (citing *Krogman*, 202 F.R.D. at 478); *see also Lumen*, 280 F.R.D. at 460 (*Cammer* does not provide a checklist but rather factors to be considered). These factors, too, support a finding that Medtronic common stock traded on an

- 18 -

efficient market.  Medtronic had a Class Period market capitalization of more than $40 billion through the Class Period, an average bid-ask spread of 0.03% and a public float that exceeded 99.7% of shares outstanding.  Feinstein Decl., ¶¶69, 73, 76.  Each of those facts supports a finding that the market for Medtronic securities was efficient.  *Krogman*, 202 F.R.D. at 478.

For the reasons set forth above, there can be no credible dispute that the market for Medtronic securities was efficient throughout the Class Period.  While there are individual issues that may remain, such as the amount of damages, those issues will be determined as to each Class member in the same manner and based on the same formulae such that common issues of law and fact will continue to predominate.  *See Schleicher*, 618 F.3d at 681 (person-specific issues such as when and how many shares for each investor are "questions [that] can be resolved mechanically" and do not prevent class certification); *Leyva v. Medline Indus.*, 716 F.3d 510, 513-14 (9th Cir. 2013) ("'amount of damages is invariably an individual question and does not defeat class action treatment'"); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("It is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3).").[6]  Accordingly, the members of the Class are entitled to a presumption of reliance.  *Retek*, 236 F.R.D. at 437.

---

[6]   While the Supreme Court recently reversed a grant of class certification where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class," *Comcast Corp. v. Behrend*, __U.S.__, 133 S. Ct. 1426, 1433, 1436 (2013), *Comcast* merely stands for the proposition in a non-securities case that "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability" for a class to be certified under Rule 23(b)(3).  *Leyva*, 716 F.3d at 514; *Comcast*,

### c.    Plaintiffs Are Entitled to a Presumption of Reliance Pursuant to *Affiliated Ute*

Based on the Complaint's allegations regarding defendants' scheme to defraud, plaintiffs are also entitled a presumption of reliance under *Affiliated Ute*.

The *Affiliated Ute* presumption applies to claims "involving primarily a failure to disclose." 406 U.S. at 153; *see, e.g.*, *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  In such circumstances, "positive proof of reliance is ***not*** a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153-54; *Vervaecke*, 578 F.2d at 717 (acknowledging "'"reliance has little rational role" in cases of nondisclosure, largely because of the difficulty of proving reliance on the negative'").  Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Affiliated Ute*, 406 U.S. at 153-54.

The *Affiliated Ute* presumption reflects the reality that where no positive statements exist "'reliance as a practical matter is impossible to prove.'"  *In re Facebook, Inc., IPO & Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013).  As Judge Pauley in the Southern District of New York recently explained:

> The *Affiliated Ute* doctrine, in other words, is a pragmatic one.  When a defendant's fraud consists primarily of omissions, "[r]equiring a plaintiff to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." . . . Accordingly, reliance is presumed when it would be impossible to prove.

*In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).

---

133 S. Ct. at 1435-36 ("[T]he decision should not be read to require, as a prerequisite to certification, that damages attributable to a classwide injury be measurable on a "'class-wide basis."'" (Ginsburg & Breyer, JJ., dissenting)).

Furthermore, because materiality itself is a common question, a plaintiff need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged. *See Amgen*, 133 S. Ct. at 1195. ("[B]ecause '[t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor,' materiality can be proved through evidence common to the class.") (some alterations in original); *In re Sadia*, 269 F.R.D. 298, 308 (S.D.N.Y. 2010) ("Demonstrating materiality under the fraud on the market and *Affiliated Ute* presumptions presents essentially the same inquiry."); *Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176 (S.D.N.Y. 2005) ("[T]he *Affiliated Ute* presumption is simply the fraud on the market presumption applied to material omissions. Both presumptions depend on the materiality of the undisclosed or misstated information."); *see also In re MetLife Demutualization Litig.*, 229 F.R.D. 369, 378-80 (E.D.N.Y. 2005). Here, there can be no dispute that materiality has been adequately alleged.

The Complaint alleges numerous material "omissions" as part of defendants' scheme, including: (i) failing to disclose and covering up safety risks and potentially life-threatening side effects associated with INFUSE and AMPLIFY; (ii) failing to fully disclose the rampant conflicts of interests and massive payments made by Medtronic to journal authors; and (iii) failing to disclose that Medtronic had in fact drafted certain of the journal articles whose results and impartiality would subsequently be called into question. Dkt. No. 76 at 13, 16, 18, 21, 47.

Moreover, two separate and prominent investment banks, J.P. Morgan Securities LLC ("J.P. Morgan") and Wells Fargo Securities LLC ("Wells Fargo"), issued research reports on

- 21 -

July 5, 2011 describing the severe negative fallout as a result of *The Spine Journal*'s June 28, 2011 issue.[7] *See, e.g.*, Wells Fargo's report, entitled "MDT: *Spine Journal* Represents Tip of Iceberg – Downgrading Shares Downgrading To Market Perform." Williams Decl., Ex. 9; Feinstein Decl., ¶122. *See also* J.P. Morgan's report, entitled "What the Docs Are Saying on Infuse: Early Feedback Suggests Significant Franchise Risk." ¶115 (noting that of the surgeons who had read *The Spine Journal* issue, 90% expected to reduce their use of INFUSE by 54%).

This Court's opinion in *In re St. Paul Travelers Sec. Litig. II*, 2006 U.S. Dist. LEXIS 70261 (D. Minn. Sept. 25, 2006), is instructive. In *St. Paul Travelers*, plaintiffs alleged that defendants had engaged in an "industry-wide bid-rigging scheme" with respect to inflated insurance policy quotes and that "defendants' financial statements were therefore false and misleading when made." *Id.* at *3-*7. Discussing whether defendants had made material omissions, the Court held that "[p]articipation in illegal bid-rigging and the other activities alleged would certainly be considered important to investors. Defendants did not have a duty to accuse themselves of wrongdoing, but they could have disclosed material facts fully indicating how they were accomplishing increases in revenue and market share." *Id.* at *10. The same analysis applies here, and there is no doubt that plaintiffs are entitled to rely on the *Affiliated Ute* presumption to establish reliance.

---

[7]   Numerous courts have recognized that securities analysts' reactions can provide an "indicia" of materiality. *In re United States Bioscience Sec. Litig.*, 806 F. Supp. 1197, 1206 (E.D. Pa. 1992); *see also United States v. Schiff*, 602 F.3d 152, 171 n.26 (3d Cir. 2010); *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 142 (D. Mass. 2006); *In re Facebook, Inc.*, 986 F. Supp. 2d 487, 520 (S.D.N.Y. 2013).

### 2. The Event Study Methodology Is Capable of Measuring Damages on a Classwide Basis

Proof of damages is not a prerequisite to class certification, nor does it present individual issues likely to predominate over common issues. *IKO*, 757 F.3d at 603 (commonality of damages is not legally indispensable to certification); *DVI*, 639 F.3d at 640 n.23. The Third Circuit has made clear that in a "typical securities fraud action . . . damages as well as loss causation are susceptible of determination through evidence common to the class." *Id*. Where, like here, plaintiffs have demonstrated "'a "viable method" is available to prove damages on a class-wide basis,'" that is more than sufficient. *In re Heckmann Corp. Sec. Litig.*, 2013 U.S. Dist. LEXIS 79345, at *42 (D. Del. June 6, 2013) (quoting *In re Neurontin Antitrust Litig.*, 2011 U.S. Dist. LEXIS 7453, at *9 (D.N.J. Jan. 25, 2011)).

Here, plaintiffs have detailed how the event study methodology is capable of calculating damages on a classwide basis, consistent with plaintiffs' theory of the case. *See* Feinstein Decl., ¶¶157-160. The event study methodology is a widely accepted method for evaluating market efficiency, materiality and damages. *In re Diamond Foods, Inc*., 295 F.R.D. 240, 251 (N.D. Cal. 2013) (finding that because plaintiff's expert stated that "damages 'will be calculated using an event study analysis similar to the event study analysis' regarding market efficiency," that is sufficient). The use of the event study methodology, detailed in the Feinstein Declaration, is capable of calculating classwide damages in accordance with widely used and generally accepted methodologies and the applicable statutes. Feinstein Decl., ¶¶157-160. Further, the approach described allows the

- 23 -

calculation of classwide damages to be specifically responsive to varying allegations of misrepresentation and omission. *Id.*

### 3. A Class Action Is Superior to Other Available Methods for the Efficient Adjudication of This Case

Finally, Rule 23(b)(3) also requires that the class action vehicle be superior to any other method of adjudication. To determine whether a class action is superior, the Court must consider four factors: (a) class members' individual interests in controlling the prosecution of separate actions; (b) whether other litigation has already commenced; (c) the desirability of concentrating claims in one forum; and (d) the difficulties likely to be encountered in managing a class action. These factors all weigh in favor of certification here.

First, there is no indication that any member of the Class would prefer to control the prosecution of these claims individually. Indeed: "Given the prohibitive costs required for the prosecution of a sophisticated securities fraud case, very few Class members could prosecute these claims on an individual basis." *See Retek*, 236 F.R.D. at 437; *Select Comfort*, 202 F.R.D. at 611 (recognizing that in securities fraud cases the "claims of individual investors are often too small to warrant separate lawsuits"). In any event, any individual who may so desire will have the opportunity to opt out of the Class. Second, counsel are unaware of any other litigation against these defendants asserting these claims. Third, concentration of this litigation in one forum is desirable to avoid inconsistent adjudications. Moreover, class action treatment promotes fairness and efficiency: "Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary

burden on the courts." *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983); *see also, e.g.*, *Escott v. Barchris Constr. Corp.*, 340 F.2d 731, 733 (2d Cir. 1965). Fourth, this case presents no unusual difficulties in management or notification of Class members. *Cf. Select Comfort*, 202 F.R.D. at 611 (finding no unusual difficulties in a securities case with two subclasses).

For these reasons, "'[c]ourts have long recognized that [c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws,'" and "securities cases 'easily satisfy the superiority requirement of Rule 23.'" *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (alterations in original). This case is no different; a class action is superior to any other method of resolving the claims at issue in this action.

## IV. CONCLUSION

For all the reasons set forth herein, plaintiffs respectfully request an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and appointing plaintiffs as Class Representatives and Robbins Geller and Motley Rice as Class Counsel.

DATED: April 17, 2015                       Respectfully submitted,

                                            ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                            SHAWN A. WILLIAMS
                                            EKATERINI M. POLYCHRONOPOULOS


                                            s/ Shawn A. Williams
                                            _____
                                            SHAWN A. WILLIAMS

- 25 -

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
katerinap@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARTHUR C. LEAHY
DANIELLE S. MYERS
SUSANNAH R. CONN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
artl@rgrdlaw.com
dmyers@rgrdlaw.com
sconn@rgrdlaw.com

MOTLEY RICE LLC
JAMES M. HUGHES
DAVID P. ABEL
CHRISTOPHER F. MORIARTY
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
jhughes@motleyrice.com
dabel@motleyrice.com
cmoriarty@motleyrice.com

Lead Counsel for Plaintiffs

- 26 -

ZIMMERMAN REED, PLLP
CAROLYN G. ANDERSON, MN 275712
ANNE T. REGAN, MN 333852
BRIAN C. GUDMUNDSON, MN 336695
1100 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
Telephone:  612/341-0400
612/341-0844 (fax)
Carolyn.Anderson@zimmreed.com
Anne.Regan@zimmreed.com
Brian.Gudmundson@zimmreed.com

Liaison Counsel

PRICE OKAMOTO HIMENO
    LUM
WARREN PRICE, III
ROBERT A. MARKS
728 Ocean View Center
707 Richards Street
Honolulu, HI  96813
Telephone:  808/538-1113
808/533-0549 (fax)

Additional Counsel for Plaintiffs