# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| WEST VIRGINIA PIPE TRADES HEALTH & WELFARE FUND, EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF HAWAII, and UNION ASSET MANAGEMENT HOLDING AG, | Civil No. 13-1686 (JRT/FLN) |
| Plaintiffs, | **ORDER CERTIFYING CLASS** |
| v. | |
| MEDTRONIC, INC., WILLIAM A. HAWKINS, GARY L. ELLIS, RICHARD E. KUNTZ, JULIE BEARCROFT, RICHARD W. TREHARNE, and MARTIN YAHIRO, | |
| Defendants. | |

Christopher M. Wood and Shawn A. Williams, **ROBBINS GELLER RUDMAN & DOWD LLP**, 1 Montgomery Street, Suite 1800, San Francisco, CA 94104; Carolyn G. Anderson, **ZIMMERMAN REED, PLLP**, 1100 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402; William H. Narwold, **MOTLEY RICE LLC**, One Corporate Center, 20 Church Street, Seventeenth Floor, Hartford, CT 06103, for plaintiffs.

Steven M. Farina, **WILLIAMS & CONNOLLY LLP**, 725 Twelfth Street Northwest, Washington, DC 20005; Theresa M. Bevilacqua, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for defendants.

Plaintiffs West Virginia Pipe Trades Health & Welfare Fund, Employees' Retirement System of the State of Hawaii, and Union Asset Management Holding AG (collectively, "Plaintiffs") bring this consolidated class action against Medtronic and several of its officers and employees (collectively, "Medtronic"), alleging that Medtronic engaged in a scheme to defraud investors in violation of federal securities laws.

Plaintiffs have moved to certify class. The proposed class is defined as:

> All persons or entities who purchased or otherwise acquired the publicly traded common stock of Medtronic between September 8, 2010 and August 3, 2011 (the "Class Period"), and who were damaged by defendants' alleged violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

Medtronic opposes class certification and also argues that, if the Court grants Plaintiffs' motion to certify class, the end of the class period should be shortened from August 3, 2011, to June 28, 2011.

The Court will grant Plaintiffs' motion to certify class but will modify the class period to end on June 28, 2011.

## BACKGROUND

## I.     INFUSE AND THIS ACTION

This case centers on Medtronic's INFUSE product. INFUSE is the "trade name of rhBMP-2," which is a bone morphogenetic protein ("BMP") that induces the body to develop new bone tissue. (Consolidated Class Action Compl. ("Compl.") ¶ 7, Nov. 4, 2013, Docket No. 28.) INFUSE is an alternative to replacement bone-tissue grafts and was the first BMP to reach the market. (*Id.*) The FDA approved INFUSE for what the plaintiffs allege are somewhat limited treatment purposes: certain treatment of degenerative disc disease, dental surgery, and certain shin fractures. (*Id.* ¶ 8.)

INFUSE was never approved, however, "for any spinal fusion indication other than [the disc] surgeries." (*Id.*)  INFUSE is a key part of Medtronic's "spinal segment" of business, which generated more than $3.5 billion in revenue in 2008, 2009, and 2010. (*Id.* ¶ 20.)  Relevant to this case, Medtronic also sought FDA approval for AMPLIFY, a second-generation BMP.  (*Id.* ¶¶ 22, 24.)

The lead plaintiffs in this case are several institutional investors:  West Virginia Pipe Trades Health & Welfare Fund, Union Asset Management Holding AG, and Employees' Retirement System of the State of Hawaii, all of which allege that they purchased Medtronic common stock during the Class Period and were damaged by the conduct alleged in the complaint.  (*Id.* ¶¶ 43-45.)  They bring this action against Medtronic and several of its officers and employees.  (*Id.* ¶¶ 47-52.)

The only remaining allegation is that before and during the Class Period, Medtronic engaged in a scheme or course of conduct to manipulate the early clinical studies, which propelled INFUSE to success despite omitting many of INFUSE's adverse effects.  (*Id.* ¶¶ 162-65.)  Plaintiffs allege that early INFUSE clinical studies revealed safety risks that threatened Medtronic's goals for the product and, as a result, Medtronic "embarked on a scheme with physician investigators and authors to conceal the significant safety risks from the public and physician community."  (*Id.* ¶¶ 15, 163.)  They allege that Medtronic did so by "forg[ing] relationships, including financial relationships, with physician authors who published research articles in respected medical journals and knowingly concealed in those original articles, or omitted altogether, known facts regarding INFUSE's adverse side effects observed in clinical trials," and that these

research articles "overstated apparent disadvantages of alternate bone graft procedures . . . as opposed to treatment with INFUSE." (*Id.* ¶ 16.) Plaintiffs also allege that Medtronic and the consulting physicians "knew but failed to disclose that Medtronic had paid millions of dollars to the same physician authors and that during the drafting process[ ] Medtronic employees heavily edited the articles and specifically excised true facts learned during clinical trials about the efficacy and side effects of INFUSE, which would have alerted the public and physicians using INFUSE about its harmful side effects and lack of clinical benefit." (*Id.* ¶ 17.)

## II. POSSIBLE CORRECTIVE DISCLOSURES

One critical dispute is which public disclosures made the market aware of Medtronic's alleged wrongdoing – especially the alleged scheme to manipulate early clinical studies. The parties cite three possible dates for the corrective disclosure.

On June 28, 2011, *The Spine Journal* devoted an entire issue to critical studies of INFUSE, disclosing the financial conflicts of interest by the researchers who had published initial studies finding that the product was safe. (*Id.* ¶ 4.) *The Spine Journal* reported that for twelve of the studies, "the median-known financial association between the authors and Medtronic Inc. was found be approximately $12,000,000–$16,000,000 per study (range, $560,000–$23,500,000)." (*Id.* ¶ 30.) Moreover, *The Spine Journal* reported that the incidence of adverse events experienced in connection with INFUSE's use was between 10 and 50 times the rates published in industry-supported studies. (*Id.*

¶¶ 18, 30.)  Medtronic argues that the June 28, 2011, issue of *The Spine Journal* constitutes the corrective disclosure.

On July 5, 2011, Wells Fargo and J.P. Morgan published analyst reports detailing the potential market effects of the disclosures in *The Spine Journal*.  (Decl. of Shawn A. Williams ("Williams Decl.") ¶ 2, Ex. 7, Mar. 24, 2017, Docket No. 197; Decl. of Christopher M. Wood ("Wood Decl.") ¶ 2, Ex. 3, June 27, 2017, Docket No. 331.)  The Wells Fargo report began, "We believe the InFuse papers published in The Spine Journal on June 28 will have broader implications for [Medtronic] and its spine business than the Street currently expects."  (Williams Decl. ¶ 2, Ex. 7 at 283.)  Wells Fargo predicted that "The Spine Journal papers will reduce InFuse sales by 30-50%" and would likely lead the FDA to "announce a formal review of InFuse."  (*Id.*, Ex. 7 at 284.)  Similarly, the J.P. Morgan report focused on the "scathing criticism of Medtronic's Infuse" contained in *The Spine Journal*.  (Wood Decl. ¶ 2, Ex. 3 at 33.)  J.P. Morgan reported that "in the wake of the June issue of *The Spine Journal*," surgeons reported that they were less likely to use INFUSE.  (*Id.*, Ex. 3 at 35.)  Both reports focused almost exclusively on the disclosures contained within *The Spine Journal*.

Finally, on August 3, 2011, Medtronic announced that it hired Yale for $2.5 million and released the INFUSE data for Yale researchers to conduct a review.  (Compl. ¶ 117.)  Plaintiffs argue that the August 3, 2011, announcement about the decision to hire Yale constitutes the corrective disclosure.

## DISCUSSION

### I.    STANDARD OF REVIEW

The district court is "accorded broad discretion to decide whether [class] certification is appropriate." *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012) (quotation omitted).  To certify a class, a plaintiff must show that the numerosity, commonality, typicality, and adequacy of representation requirements of Federal Rule of Civil Procedure 23(a) are met and that the class comports with one of the three types of classes identified in Rule 23(b).  *Mathers v. Northshore Mining Co.,* 217 F.R.D. 474, 483 (D. Minn. 2003).  The Court accepts the substantive allegations in the plaintiff's complaint as true when determining if the proposed class is acceptable.  *Id.*  In determining the propriety of a class action, the focus is on whether the class satisfies Rule 23 and not whether the proposed action will prevail.  *Id.*  The Court must undertake a "rigorous analysis" to assure that these requirements are met.  *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982).

### II.    CLASS CERTIFICATION

#### A.  Rule 23(a)(1) Requirements

To certify a class, a plaintiff must meet the four requirements in Rule 23(a).  First, the class must be so numerous that joinder of all members is impracticable ("numerosity").  Fed. R. Civ. P. 23(a)(1).  Second, there must be questions of law or fact common to the class ("commonality").  *Id.* at 23(a)(2).  Third, the claims or defenses of

the representative parties must be typical of the claims or defenses of the class ("typicality"). *Id.* at 23(a)(3). Fourth, the representative parties must fairly and adequately protect the interests of the class ("adequacy of representation"). *Id.* at 23(a)(4).

### 1. Numerosity

The Court must determine whether the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement is generally satisfied in class actions involving nationally traded securities. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, No. 5:12-cv-5162, 2016 WL 5400373 at *4 (W.D. Ark. Sept. 20, 2016). Medtronic has stipulated that Plaintiffs' proposed class satisfies the numerosity requirement. (Wood Decl. ¶ 2, Ex. 1 at 2.) During the class period, an average of 6.5 million shares of Medtronic stock were traded daily and 1,187 major institutions owned Medtronic stock. (Williams Decl. ¶ 1, Ex. 1 ¶¶ 45, 53.) The Court will conclude that Plaintiffs' proposed class, therefore, satisfies the numerosity requirement.

### 2. Commonality

The Court must determine whether "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "While not every question of law and fact must be common to the entire class, Plaintiffs must show that the course of action giving rise to their cause of action affects all putative class members, or that at least one of the elements of that cause of action is shared by all of the putative class members." *In re*

*GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 328 (D. Minn. 2005).  Commonality is easily satisfied in securities cases.  *See id.* ("This case links a common legal theory—securities law violations—to a common group—purchasers of [the defendant's] shares.") Medtronic does not challenge whether Plaintiffs meet the commonality requirement.  The Court will conclude that Plaintiffs' proposed class satisfies the commonality requirement.

### 3.  Typicality

The Court must determine whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). Typicality suggests that "there are other members of the class who have the same or similar grievances as the [representative] plaintiff."  *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1275 (8th Cir. 1990) (quotation omitted).  "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory."  *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996). Medtronic challenges whether Plaintiffs meet the typicality requirement with respect to the length of the class period, which is discussed at length in Part III.  Plaintiffs, like all members of the proposed class, purchased Medtronic stock during the class period. According to Plaintiffs' allegations, all class members suffered damages as a result of Medtronic's fraudulent scheme.  The Court will conclude that Plaintiff's claims are typical of the claims and defenses of the class.

### 4.  Adequacy of Representation

The Court must determine whether "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Rule 23(a)(4) involves two questions: (1) whether the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel.  *Paxton v. Union Nat. Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982).

The Court finds that Plaintiffs have common interests with the members of the class and will vigorously prosecute the interests of the class.  Plaintiffs are institutional shareholders that share the class's common interest in obtaining damages for Medtronic's alleged violations of securities laws.  *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104 (S.D.N.Y. 2016).  Plaintiffs have testified to their willingness to vigorously prosecute the interests of the class.  (Williams Decl. ¶ 2, Exs. 2-4.)  As discussed below, Plaintiffs' counsel is well-qualified to serve as class counsel in this case.  Medtronic does not challenge whether Plaintiffs are adequate representatives in this case.  The Court therefore will conclude that Plaintiffs will adequately and fairly protect the interests of the class.

Plaintiffs' counsel—lawyers from Robbins Geller Rudman & Dowd LLP and Motley Rice LLC—is well-qualified to serve as class counsel in this case.   First, the filings in this case demonstrate that counsel has sufficiently investigated and identified potential claims in this case.  *See* Fed. R. Civ. P. 23(g)(1)(A)(i).  Second, counsel has experience serving as class counsel in other disputes.  (Williams Decl. ¶ 2, Exs. 5 & 6);

*see also* Fed. R. Civ. P. 23(g)(1)(A)(ii).  Third, counsel has demonstrated in this case and others that they have significant knowledge of securities law.  (Williams Decl. ¶ 2, Exs. 5 & 6); *see also* Fed. R. Civ. P. 23(g)(1)(A)(iii).  Finally, the Court is persuaded that counsel has sufficient resources to serve as class counsel in this case.  (Williams Decl. ¶ 2, Exs. 5 & 6); *see also* Fed. R. Civ. P. 23(g)(1)(A)(iv).  The Court will therefore appoint Robbins Geller Rudman & Dowd LLP and Motley Rice LLC to serve as class counsel in this case.

### B.  Rule 23(b)(3)

The Court must determine whether Plaintiffs' proposed class falls into one of the three categories of Rule 23(b).  Fed. R. Civ. P. 23.  Under Rule 23(b)(3), a class action may be maintained if "the court finds that the questions of law or fact common to class members **predominate** over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.*  (emphasis added).  A class action must also be superior to other methods of adjudication.  *Id.*

"At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence . . . . If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question."  *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016) (quotation omitted).  If the defendant's liability is common to the class, then common questions are held to predominate over individual questions.

*In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 610 (D. Minn. 2001). "Common questions need only predominate; they need not be dispositive of the litigation." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995).

A Section 10(b) action involves six basic elements:

(1) A material misrepresentation or omission;

(2) Scienter;

(3) A connection with the purchase or sale of a security;

(4) Reliance;

(5) Economic loss; and

(6) Loss causation, i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharma., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Elements (1)-(2) "relate[] solely to Defendant's conduct, and as such proof for these issues will not vary among class members." *See In re Potash Antitrust Litig.*, 159 F.R.D. at 694. Potential class members must satisfy element (3) (i.e., that they purchased a Medtronic security during the class period) to join the class. But before deciding whether to grant the motion, the Court will address two issues that may require individual determinations for each class member: reliance and damages.

**1. Reliance**

In order to prevail in an action for securities fraud under Section 10(b), Plaintiffs must show reliance. *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 715-16 (8th Cir.

1978). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.,* purchasing common stock—based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*, 563 U.S. 804, 810 (2011).

Positive proof of reliance is not necessary in every securities case. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972). The Supreme Court in *Affiliated Ute* held that, in cases involving a failure to disclose, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* The *Affiliated Ute* presumption is appropriate in cases where the "thrust" of the plaintiffs' allegations is omissions and not affirmative representations. *Vervaecke*, 578 F.2d at 716-18. But the *Affiliated Ute* presumption is easier stated than applied because "every misstatement both advances false information and omits truthful information." *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000), *abrogated on different grounds by Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017). The Southern District of New York has described the *Affiliated Ute* presumption as a matter of practicality:

> The distinction between misstatements and omissions is often illusory . . . . In view of this semantic difficulty, what is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute*, in which no positive statements exist: reliance as a practical matter is impossible to prove. The *Affiliated Ute* doctrine, in other words, is a pragmatic one. When a defendant's fraud consists primarily of omissions, requiring a plaintiff to show a speculative set of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an

> unrealistic evidentiary burden on the 10(b) plaintiff.
> Accordingly, reliance is presumed when it would be
> impossible to prove.

*In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) (quotations, modifications, and citation omitted). "[W]ithout the presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action: Each plaintiff would have to prove reliance individually, so common issues would not predominate over individual ones, as required by Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II)*, 134 S. Ct. 2398, 2416 (2014) (quotation omitted).

The facts of this case suffer from the illusory distinction between affirmative representations and omissions. Plaintiffs' complaint describes various affirmative representations and omissions made by various actors in various contexts. The Court must decide whether the "thrust" of Plaintiffs' suit is affirmative representations or omissions. *See Vervaecke*, 578 F.2d at 716-18.

Medtronic argues that Plaintiffs cannot benefit from the *Affiliated Ute* presumption because Plaintiffs' claims are based on the journal articles' statements downplaying risks associated with rhBMP-2 and overstating the disadvantages of bone-graft procedures. Certainly, statements in the journal articles about the efficacy and safety of rhBMP-2 are affirmative representations and not omissions. But the statements in the journal articles are not the focus of Plaintiffs' claims. "Notably, the [Plaintiffs] did not assert a false claim based on the clinical trials." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393 n.3 (8th Cir. 2016). Rather, the crux of Plaintiffs' scheme liability claims is that Medtronic **paid physicians** to conceal adverse events and

- 13 -

side effects associated with the use of INFUSE and to overstate the disadvantages of bone graft procedures.  (*See* Compl. ¶ 163); *see also W. Va. Pipe Trades Health & Welfare Fund.*, 845 F.3d at 393.

In deciding whether Plaintiffs can benefit from the *Affiliate Ute* presumption for purposes of their scheme liability claims, the Court must determine whether Medtronic's failure to disclose that the authors were paid allegedly to induce their complicity in concealing adverse events related to INFUSE was an affirmative representation or an omission.  Plaintiffs allege that over fourteen years Medtronic paid the authors of these studies $210 million to conceal the adverse side effects caused by INFUSE.  (Compl. ¶ 87(c).)  *The Spine Journal* issue devoted to INFUSE concluded that, with respect to twelve of the studies, "the median-known financial association between the authors and Medtronic Inc. was found to be approximately $12,000,000-$16,000,000 per study." (Compl. ¶ 30.)  These payments were not disclosed to the investing public and, as the J.P. Morgan and Wells Fargo reports suggest, were considered important to a reasonable investor.  *See Affiliated Ute*, 406 U.S. at 154.

The Court finds *Fogarazzo v. Lehman Bros., Inc.*, instructive.  232 F.R.D. 176 (S.D.N.Y. 2005).  The plaintiffs in *Fogarazzo* alleged that several large banks engaged in a fraudulent scheme to manipulate equity analyst reports on RSL Communications, Inc., in exchange for business, fees, and other profits.  *Id.* at 178.  In reality, "the Banks, knowing that RSL was actually in decline, inflated the price of RSL shares and then worked doubly hard to conceal or obfuscate the meaning of every fact that would have

revealed that decline to the investing public." *Id.* In concluding that the *Affiliated Ute*

presumption applies, the district court stated:

> Indeed, the theory behind the *Affiliated Ute* presumption—
> that, when material information is concealed, plaintiffs should
> only have to prove that a reasonable investor might have
> considered the omitted facts important in the making of
> her investment decision—is not undermined simply because a
> defendant makes misstatements at the same time it omits
> material information. In this case, plaintiffs allege that
> defendants **omitted their own *quid pro quo* arrangements
> in addition to deliberately misrepresenting their opinions**.
> If plaintiffs prove that a reasonable investor might have
> considered the omitted facts material in making an investment
> decision, then plaintiffs may employ the *Affiliated Ute*
> presumption to establish reliance on a common basis with
> respect to the alleged omissions.

*Id.* at 186 (quotations and citation omitted) (emphasis added). The *Fogarazzo* Court did

not focus on the banks' misleading statements about RDL's success (or lack thereof).

Rather, the Court focused on the quid pro quo arrangements between the authors of the

reports (the banks) and the subject of those reports (RDL).

Analogously, Plaintiffs allege that Medtronic (like RDL) paid the authors of the

journal articles (like the banks) millions to make false representations about the efficacy

of rhBMP-2 and INFUSE. *See id.* at 178. Yes, the authors made false statements within

their articles. But the relevant omission in this case is "[Medtronic's] own *quid pro quo*

arrangements" with the authors of the journal articles. *See id.* The Court, therefore, finds

that the thrust of the scheme liability claim is omissions, not affirmative statements. *See*

*Affiliated Ute*, 406 U.S. at 154.

Medtronic argues that the journal articles themselves disclose that the authors had received compensation and, therefore, there can be no omission. At least some of the articles disclose that "[i]n support of their research for or preparation of this work, one or more of the authors received, in any one year, outside funding or grants in **excess of $10,000** from Medtronic." (Decl. of Steven M. Farina ¶ 7, Ex. 5 at 99, May 8, 2017, Docket No. 273 (emphasis added).) There is nothing false about this disclosure; $210 million is unquestionably more than $10,000. But this disclosure does not even begin to capture the size or scope of the alleged omission in this case. According to Plaintiffs, the payments at issue were not merely "[i]n support of their research for or preparation of this work," (*id.*,) but to "conceal, or significantly downplay, known adverse events." (Compl. ¶ 83.) Moreover, in the mind of the reasonable investor, payments totaling $210 million are something quite different than several payments "in excess of $10,000." The public's response to *The Spinal Journal*'s exposé demonstrates how insignificant the journal articles' disclosure was in assessing the validity of the studies. Following *The Spine Journal*'s disclosure that the authors were paid millions of dollars, J.P. Morgan found that "more than half (58%) of the surgeons thought that it diminished the value of the data to direct their treatment decisions, while 15% said that significant financial conflicts completely invalidated the studies' conclusions." (Wood Decl. ¶ 2, Ex. 3 at 34.) No evidence suggests that these concerns existed – at least to this degree – prior to *The Spine Journal* issue. The Court finds that the journal articles did not disclose Medtronic's $210 million payment to the authors.

The Court will therefore conclude that Plaintiffs can benefit from the *Affiliated Ute* presumption.

### 2. Damages

Damages traditionally require individual computation for each member in the class and, therefore, Plaintiffs must show that "damages are susceptible of measurement across the entire class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). "Calculations need not be exact, but at the class-certification state (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case . . . ." *Id.* (quotations and citation omitted). Plaintiffs may establish that "it is possible to prove classwide common injury and to reliably compute classwide damages" through an expert report proposing a method of calculation. *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 489 (D. Minn. 2015).

Professor Steven P. Feinstein has submitted a report suggesting that Plaintiffs are able to calculate damages on a classwide basis using an event study. (Williams Decl. ¶ 2, Ex. 1 ¶¶ 25-28.) According to the U.S. District Court for the Central District of California, "[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) (quotations and citations omitted). Medtronic does not challenge for purposes of class certification the use of an event study to calculate damages.

The Court will find that Plaintiffs have submitted sufficient evidence at this stage showing that they are able to use a common methodology to calculate damages for class members.

### 3.  Superiority

Finally, the Court finds that a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.  Fed. R. Civ. P. 23(b)(3).  To guide the inquiry, Rule 23(b)(3) sets forth four factors to consider: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.  *Id.*

Securities cases easily satisfy Rule 23(b)(3)'s superiority requirement.  *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009).  First, the Court has no reason to believe that the class members have any interest in individually controlling the prosecution of separate actions.  Indeed, the cost and complexity of securities actions often prevent individual shareholders from bringing such claims.  *See id.*  Second, the Court is not aware of any other litigation begun by class members.  Third, concentrating the litigation in this case is desirable to promote judicial efficiency by resolving the complaints of thousands of shareholders in one case.  Finally, the Court does not believe that this case presents any likely difficulties that would make a class action inferior to

individual adjudication.  Rather, the Court finds that – due to the large number of possible class members – a class action is necessary to avoid potentially crowding the docket with thousands of similar cases.  The Court therefore finds that a class action is superior to other available methods of adjudication.  Fed. R. Civ. P. 23(b)(3).

 Having found that all of the requirements of Rule 23 are met, the Court will grant Plaintiffs' motion to certify class.

## III.    CLASS PERIOD

Before granting the motion, the Court must consider one final issue:  whether the end of the class period should be shortened from August 3, 2011, to June 28, 2011.

In a securities class action, the class period ends "when curative information is publicly announced or otherwise effectively disseminated to the market."  *In re Ribozyme Pharmas., Inc. Sec. Litig.*, 205 F.R.D. 572, 579 (D. Colo. 2001).  "Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, if investors already know the truth, false statements won't affect the price."  *Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016) (quotation omitted).  Once the deception is publicly revealed for the first time by a corrective disclosure, a reasonable investor cannot be said to have relied on the company's misrepresentation or omission in deciding to invest.  *Halliburton II*, 134 S. Ct. at 2413-14 ("[I]f the plaintiff did not buy or sell the stock after the misrepresentation was made but before the truth was revealed, then he could not be said to have acted in reliance on a fraud-tainted price.").  When a court considers whether a disclosure is sufficient to

terminate a class period, it must determine if there is a "substantial question of fact as to whether the release had cured the market." *Friedlander v. Barnes*, 104 F.R.D. 417, 421 (S.D.N.Y. 1984).

The ability to rebut an alleged corrective disclosure becomes particularly important in cases – like this one – where the parties dispute what event serves as the corrective disclosure. If the corrective disclosure occurred on August 3, 2011, then all investors who purchased Medtronic securities from September 8, 2010, to August 3, 2011, are included in the class. But if the corrective disclosure occurred on June 28, 2011, then only those investors who purchased Medtronic securities before June 28, 2011, are included in the class because investors who purchased securities after June 28, 2011, cannot establish the presumption of reliance. *See Halliburton II*, 134 S. Ct. at 2413-14.

### A. Stage of Litigation

Before the Court can decide on which date the corrective disclosure occurred, the Court must first decide whether the class-certification stage is the appropriate procedural stage for the Court to rule on whether the disclosures at issue were corrective.

In a recent line of cases beginning with *Halliburton I* and ending with *Halliburton II*, the Supreme Court has considered to what extent plaintiffs in a securities case must prove the elements of reliance for purposes of class certification. *See Halliburton II*, 134 S. Ct. at 2405; *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013); *Halliburton I*, 563 U.S. at 806. Since *Halliburton II*, district courts have reached

differing conclusions about whether to decide that a particular event constitutes a corrective disclosure at the class-certification stage or, in the alternative, to wait until such issues are brought on a motion for summary judgment.[1]

Plaintiffs argue that *Halliburton I* bars the Court from considering the date of corrective disclosure at the class-certification stage. In *Halliburton I*, the Supreme Court considered whether a plaintiff must prove loss causation (that the defendant's deceptive conduct caused the plaintiff's claimed economic loss) at the class certification stage to invoke the *Basic* presumption of reliance – a cousin of the *Affiliated Ute* presumption.[2] *Halliburton I*, 563 U.S. at 807, 809-12. The district court in *Halliburton I* required the plaintiffs to prove – in addition to the requisite elements of the *Basic* presumption[3] – that (1) the decline in Halliburton's stock was caused by the correction of a prior misleading

---

[1] *Compare Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015) (acknowledging that "a finding that a particular disclosure was not corrective as a matter of law would sever the link between the alleged misrepresentation and the price received," but concluding that this inquiry is barred by *Amgen* because the court "is unable to unravel such a finding from the materiality inquiry" (quotations omitted)), *with Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST, 2016 WL 7406418, at *7-9 (N.D. Cal. Dec. 22, 2016) (concluding that *Amgen* did not bar the court from considering the date of corrective disclosure at class certification because "nobody is arguing that the original misrepresentations were immaterial or that evidence of MagnaChip's misconduct had already entered the market when MagnaChip released its fraudulent financial reports between 2011 and early 2014").

[2] All of the Supreme Court cases discussed here concern the *Basic* presumption and not the *Affiliated Ute* presumption. The Court concludes that there is no significant difference between the *Basic* presumption and the *Affiliated Ute* presumption for purposes of setting the class period – both require setting the end of the class period at the date of the corrective disclosure.

[3] Under the *Basic* presumption, plaintiffs must demonstrate that the alleged misrepresentations were publicly known, that the stock traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. *Id.* at 811.

statement, and (2) the subsequent loss could not otherwise be explained by some additional factors revealed then to the market. *Id.* at 811-12. The Supreme Court distinguished loss causation from reliance. *Id.* at 812. Reliance is a form of "transaction causation" and concerns the "facts surrounding the investor's decision to engage in the transaction." *Id.* In contrast, "loss causation" requires "a plaintiff to show that a misrepresentation that affected the integrity of the market price also caused a subsequent economic loss." *Id.* Requiring a plaintiff to prove loss causation to benefit from a presumption of reliance contravenes the fundamental premise "that an investor **presumptively** relies on a misrepresentation **so long as it was reflected in the market price at the time of his transaction**." *Id.* at 813 (emphasis added). The Supreme Court held that plaintiffs do not need to prove loss causation and thus remanded the case. *See id.* at 815.

Plaintiffs claim that consideration of the date of corrective disclosure would amount to consideration of loss causation in contravention of *Halliburton I*. Not so. Loss causation requires plaintiffs to show that defendant's misrepresentation or omission **caused** the plaintiffs subsequent loss. *Id.* at 812. In contrast, the date of corrective disclosure concerns when this misrepresentation or omission was **publicly revealed**; it does not concern actual causation. A plaintiff cannot establish reliance after a corrective disclosure unveiled the fraud and, therefore, the fraud was no longer "reflected in the market price at the time of his transaction." *Halliburton I*, 563 U.S. at 813. The Court can decide the date that the purported misrepresentation or omission was disclosed to the

public without deciding whether the underlying misrepresentation or omission ultimately caused a plaintiff's loss.  *Halliburton I* is thus distinguishable from this case.

Several years later, the Supreme Court considered in *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds* whether a plaintiff is required to prove at the class certification stage that the defendant's alleged misrepresentations materially affected the defendant's stock price.  568 U.S. 455 (2013).  The defendant argued that materiality is an essential element to establishing the *Basic* presumption applies and, therefore, plaintiffs are required to prove materiality before invoking the presumption at the class certification stage.  *Id.* at 466.  The Supreme Court cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Id.*  According to the Supreme Court, "the pivotal inquiry is whether proof of materiality is needed to ensure that the questions of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses."  *Id.* at 467 (quoting Fed. R. Civ. P. 23(b)(3)).  The Supreme Court concluded that materiality is an objective question that can be proved through evidence common to the class.  *Id.*  Moreover, "there is no risk whatever that a failure of proof on the common question of materiality will result in individual questions predominating" because "the failure of proof on the element of materiality **would end the case for one and for all**; no claim would remain in which individual reliance issues could potentially predominate."  *Id.* at 467-68 (emphasis added).  The Supreme Court, therefore, concluded that a plaintiff is not required to prove the materiality of a defendant's alleged misrepresentations and omissions at the class-certification stage.  *Id.* at 474.

- 23 -

Like *Haliburton I*, *Amgen* is distinguishable.  In *Amgen*, the Supreme Court focused on the fact that the element of materiality was more relevant to the merits than class certification, and that a failure to satisfy the element of materiality would end the case for all class members.  *Id.* at 468.  Unlike the issue of materiality, the corrective-disclosure issue in this case would not be dispositive of the claim for all proposed class members.  For purposes of the class period, Medtronic does not argue that there has been **no** corrective disclosure; it simply disagrees with plaintiffs about **when** the corrective disclosure occurred.  Regardless of whether the Court ultimately concludes that June 28, 2011, or August 3, 2011, is the proper date of corrective disclosure, there will still be a class to bring a claim.  At a minimum, investors who purchased Medtronic securities between September 8, 2010, and June 28, 2011, will be certified as a class and have the opportunity to pursue their claim against Medtronic.

If the Court refuses to consider the corrective-disclosure issue at this stage, however, individual questions that pertain to only a small subgroup of the class – investors who purchased Medtronic securities sometime between June 28, 2011, and August 3, 2011 – will arise.  An issue of reliance arises with respect to this subgroup because "an investor presumptively relies on a misrepresentation **so long as it was reflected in the market price at the time of his transaction.**"  *Halliburton I*, 563 U.S. at 813.  If the corrective disclosure occurred on June 28, 2011, then Medtronic's alleged omission could not have been reflected in the market price at the time of the subgroup's transactions and, therefore, members of that subgroup cannot benefit from the

presumption of reliance. *See Halliburton II*, 134 S. Ct. at 2413-14. Again, "without the presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action." *Id.* at 2416.

Moreover, unlike materiality, the corrective disclosure is essential to defining the class itself because it marks the end date of the class period. *Ribozyme Pharms.*, 205 F.R.D. at 579. The Supreme Court in *Amgen* held that "[m]erits questions may be considered to the extent—but only to the extent—that they are **relevant to determining whether the Rule 23 prerequisites for class certification are satisfied**." 568 U.S. at 466 (emphasis added). An order certifying a class action "must define the class." Fed. R. Civ. P. 23(c)(1)(B). The class period is an important component of the class definition:

> If a plaintiff's allegations are sufficient to satisfy Rule 23 but insufficient to sustain the class period or class definition as pled, it is then appropriate for a court to limit the class period. Thus, where undisputed facts demonstrate that the allegations of the complaint can apply only to a particular period of time, the class period may be restricted to that time period.

*McLaughlin on Class Action* § 4:3 (14th ed. 2017).[4] Courts have long recognized that they "must evaluate some aspects of the merits of plaintiffs' proposed class period to determine the appropriate endpoints." *See In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984); *see also McLaughlin*, *supra*, § 4:3 (citing cases).

Class certification in securities cases is no different. Courts have regularly examined the date of corrective disclosure at the class-certification stage in order to

---

[4] For examples of cases granting a motion for class certification, but modifying the class period, see *Stevelman v. Alias Research, Inc.*, No. 5:91-CV-682 (EBB), 2000 WL 888385, at *8 (D. Conn. June 22, 2000) and *Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 653 (S.D.N.Y. 1986); *Markewich v. Adikes*, 76 F.R.D. 68, 75 (E.D.N.Y. 1977).

decide whether the class period should be modified.[5]  *Amgen* and *Halliburton I* do not change courts' longtime practice of considering the date of corrective disclosure at the class-certification stage for purposes of determining the end of the class period.

The Supreme Court's most recent decision in *Halliburton II* affirms the Court's conclusion that the Court may modify the class period during the class-certification stage. In *Halliburton II*, the Supreme Court considered whether defendants should be afforded an opportunity to rebut the *Basic* presumption at the class certification stage by showing a lack of price impact.  134 S. Ct. at 2405.  The Supreme Court stated that that plaintiffs must **prove** – not just allege – the Rule 23(b)(3) predominance requirement, including that they qualify to invoke the *Basic* presumption.  *Id.* at 2412.  But a plaintiff cannot benefit from the *Basic* presumption "if the plaintiff did not buy or sell the stock after the misrepresentation was made but before the truth was revealed" because "he could not be said to have acted in reliance on a fraud-tainted price."  *Id.* at 2413-14.  *Basic* "does not require courts to ignore a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply."  *Id.* at 2416.  Defendants can defeat the presumption with evidence that plaintiff "would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud."  *Id.* at 2408.  The

---

[5] For examples, see *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST, 2016 WL 7406418, at *7-9 (N.D. Cal. Dec. 22, 2016); *In re Fed. Nat. Mortg. Ass'n Sec., Derivative & ERISA Litig.*, 247 F.R.D. 32, 38-41 (D.D.C. 2008); *In re Nature's Sunshine Product's Inc. Sec. Litig.*, 251 F.R.D. 656, 666-67 (D. Utah 2008); and *Garfinkel v. Memory Metals, Inc.*, 695 F. Supp. 1397, 1405-06 (D. Conn. 1988).

Supreme Court thus held that "to maintain the consistency of the presumption with the class certification requirements of Federal Rule of Civil Procedure 23, defendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Id.* at 2417.

*Halliburton II* reinforces that defendants should be afforded an opportunity to rebut the date of corrective disclosure at the class-certification stage. *Halliburton II* permits defendants to defeat the presumption of reliance at the class-certification stage with direct evidence, and shows that the presumption of reliance cannot apply to plaintiffs who purchased the securities at issue **after** "the truth was revealed" because they "could not be said to have acted in reliance on a fraud-tainted price." *Id.* at 2413-15. The Court sees no reason why defendants would not similarly be able to rebut the presumption with respect to a discrete portion of the class by introducing evidence that this portion of the class purchased the securities after the date of the corrective disclosure.

Moreover, permitting rebuttal of the date of corrective disclosure at the class-certification stage is necessary for the efficient management of class actions. Once a court certifies a class, the parties must notify all class members who can be identified through reasonable effort. *See* Fed. R. Civ. P. 23(c)(2)(B). If the class period certified is broader than the law will ultimately support, the parties will be forced to notify more individuals than necessary. And, on some future dispositive motion, the Court will still be forced to decide whether the class should have been certified with respect to these individuals in the first place. Resolving this dispute in a timely fashion and minimizing

the unnecessary expenditure of resources requires the Court to decide whether the class period should be modified as a matter of law.[6]

## A. Corrective Disclosure in this Case

The Court must now decide whether there is a material dispute of fact as to the date of corrective disclosure. The date of the corrective disclosure in this case is the date on which Medtronic's payments to the authors of the journal articles fully became public information for the first time. *See Rand-Heart*, 812 F.3d at 1180. The date of full correction "need not coincide with the stock price's absolute nadir." *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-W-ODS, 2007 WL 927745, at *4 (W.D. Mo. 2007). The parties propose three possible dates of corrective disclosure: June 28, 2011; July 5, 2011; and August 3, 2011.

The payments to physicians are the crux of Plaintiffs' scheme-liability claims and were disclosed to the public in *The Spine Journal* issue released on June 28, 2011. As a result, as of June 28, a reasonable investor would have known not to rely on the assumption that these studies were conducted without significant financial incentives. The Court therefore finds that June 28, 2011, is the date of the corrective disclosure.

---

[6] The Court acknowledges that, in some cases, there may be a material dispute of fact about the date of the corrective disclosure. If the Court were to conclude that a material dispute of fact existed regarding the date of the corrective disclosure, the Court may find it necessary to certify the longer class period while acknowledging that the class period may be limited upon further evidence. But nothing bars the Court from inquiring whether there is a material dispute of fact about the date of the corrective disclosure, and, when there is not, resolving the issue. To the extent that disputes regarding the date of corrective disclosure can be resolved at the class-certification stage, the Court should do so in order to properly "define the class." *See* Fed. R. Civ. P. 23(C)(1)(B).

The two analysts' reports published on July 5, 2011, did not present any new facts to the market. Indeed, the Wells Fargo report was titled "Spine Journal Article Represents Tip of Iceberg – Downgrading Shares Downgrading to Market Platform" and relies almost entirely on the information disclosed in *The Spine Journal*. (Williams Decl. ¶ 2, Ex. 7.) The J.P. Morgan report was similarly based wholly on the disclosures in *The Spine Journal* article:

> Last Tuesday (6/28) *The Spine Journal* released a scathing criticism of Medtronic's Infuse. In an entire issue dedicated to the subject, the editors asserted (1) systematic underreporting of adverse events in the clinical studies supporting Infuse's US approval, (2) faulty trial designs, and (3) **widespread financial conflicts of interest among the surgeons who participated in the studies and reported the results**.

(Wood Decl. ¶ 2, Ex. 3 at 33.) As the analyst reports themselves indicate, *The Spine Journal* was the first to report the significant payments Medtronic made to authors.[7] In other words, the July 5 reports "reiterated and reinforced" the June 28 disclosure, "but did not provide any new information to the market or investors." *See In re Am. Italian Pasta Co. Sec. Litig.*, 2007 WL 927745, at *4.

Nor does the Court consider Medtronic's August 3, 2011, announcement to be a corrective disclosure. On August 3, "Medtronic announced it would publicly release INFUSE data for Yale researchers to conduct a review." (Compl. ¶ 117.) Certainly, the

---

[7] The Court agrees with Plaintiffs that an analyst report can serve as a corrective disclosure. *See In re Enron Corp. Secs.*, 2005 U.S. Dist. LEXIS 41240, at *59 (S.D. Tex. Dec. 22, 2005). But this is not a case in which an analyst report first revealed the information to the market. Here, the analyst reports merely reiterated *The Spine Journal*'s reporting and projected its potential impact on the market.

decision to grant Yale researchers access to the data about the INFUSE studies was new information available to the public. *See Rand-Heart*, 812 F.3d at 1180. But the August 3 announcement merely represented efforts by Medtronic to show that, contrary to the assertions in *The Spine Journal*, INFUSE is in fact a safe product. (Compl. ¶¶ 117-18.) The August 3 effort did not reveal any new hidden information to the public; it only reveals Medtronic's prospective intent to salvage the viability of INFUSE. *Rand-Heart*, 812 F.3d at 1180. The parties focus on whether there was a significant decrease in stock price following this announcement, but the Court need not consider whether there was a decrease in stock price if no new information was revealed to the public. The entire scheme at issue – the decision to pay the authors substantial funds to conceal their findings – was fully revealed to the public by *The Spine Journal* on June 28, 2011, and therefore the omission of the scheme could not have been "reflected in the market price at the time of [a] transaction" after that date. *Halliburton I*, 563 U.S. at 813. Any investor who purchased Medtronic securities between June 28 and August 3 cannot have relied on the omission because they already knew the truth.

The Court will therefore conclude that the class period ends on June 28, 2011.

## CONCLUSION

The Court finds that the proposed class meets the threshold requirements of Rule 23(a). Furthermore, the Court finds that common issues of law and fact predominate and that a class action is likely the superior way to adjudicate the claims. Accordingly, the Court certifies this action as a class action on behalf of the class defined below:

> All persons or entities who purchased or otherwise acquired
> the publicly traded common stock of Medtronic between
> September 8, 2010 and June 28, 2011 (the "Class Period"),
> and who were damaged by defendants' alleged violations of
> §§10(b) and 20(a) of the Securities Exchange Act of 1934
> (the "Class"). Excluded from the Class are defendants and
> their families, the officers and directors of the Company, at
> all relevant times, members of their immediate families and
> their legal representatives, heirs, successors or assigns, and
> any entity in which defendants have or had a controlling
> interest.

The Court hereby finds and concludes pursuant to Rule 23 that lead plaintiffs Employees'

Retirement System of the State of Hawaii, Union Asset Management Holding AG, and

West Virginia Pipe Trades Health & Welfare Fund are adequate class representatives and

certifies these parties as representatives for the class. The Court further finds and

concludes pursuant to Rule 23(g) that the law firms of Robbins Geller Rudman & Dowd

LLP and Motely Rice LLC will fairly and adequately represent the interests of the class

and appoints Robbins Geller and Motely Rice as lead class counsel for the class.

## ORDER

Based on the foregoing, and all files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that lead plaintiffs' Renewed Motion to Certify Class [Docket

No. 194] is **GRANTED** as modified in the Conclusion of this Order.


DATED: January 30, 2018                    _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                         JOHN R. TUNHEIM
                                                        Chief Judge
                                              United States District Court