# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| WEST VIRGINIA PIPE TRADES HEALTH & WELFARE FUND, EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF HAWAII, and UNION ASSET MANAGEMENT HOLDING AG, | Civil No.  13-1686 (JRT/FLN) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| MEDTRONIC, INC., WILLIAM A. HAWKINS, GARY L. ELLIS, RICHARD E. KUNTZ, JULIE BEARCROFT, RICHARD TREHARNE, and MARTIN YAHIRO, | |
| Defendants. | |

---

Shawn A. Williams and Christopher M. Wood, **ROBBINS GELLER RUDMAN & DOWD LLP**, One Montgomery Street, Suite 1800, San Francisco, CA  94104; William H. Narwold, **MOTLEY RICE LLC**, 20 Church Street, Seventeenth Floor, Hartford, CT  06103; and Carolyn G. Anderson, **ZIMMERMAN REED, PLLP**, 80 South Eighth Street, 1100 IDS Center, Minneapolis, MN  55402, for plaintiffs.

Joseph G. Petrosinelli and Sarah Lochner O'Connor, **WILLIAMS & CONNOLLY LLP**, 725 Twelfth Street Northwest, Washington, DC  20005; and Theresa Bevilacqua, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN  55402, for defendants.

Plaintiffs retirement and investment funds ("Plaintiffs") bring this consolidated class action alleging that Medtronic, Inc., ("Medtronic") and a number of its officers and employees ("Individual Defendants") engaged in a scheme to defraud investors.  In

particular, Plaintiffs allege that Medtronic artificially inflated its stock price by manipulating early clinical studies of two bone-morphogenetic-protein ("BMP") products – INFUSE and AMPLIFY.  Individual Defendants William A. Hawkins, Gary L. Ellis, Richard E. Kuntz, Dr. Julie Bearcroft, Dr. Richard Treharne, and Dr. Martin Yahiro move for summary judgment for the scheme-liability claims and control-person claims brought against them.  The Court will grant in part and deny in part the Individual Defendants' Motion for Summary Judgment.

## BACKGROUND

### I.    FACTUAL BACKGROUND

INFUSE is the "trade name of rhBMP–2," which is a BMP that induces the body to develop new bone tissue.[1]  (Am. Comp. ("Compl.") ¶ 7, Nov. 4, 2013, Docket No. 28.) INFUSE is an alternative to grafting replacement bone tissue and was the first BMP to reach the market.  (*Id.*)  The FDA approved INFUSE in 2002 for what Plaintiffs allege are somewhat limited treatment purposes:  degenerative disc disease, dental surgery, and certain shin fractures.  (*Id.* ¶ 8.)  INFUSE is a key part of Medtronic's "spinal segment" of business, which generated more than $3.5 billion in revenue in 2008, 2009, and 2010. (*Id.* ¶ 20.)  Medtronic also sought FDA approval for AMPLIFY, a second-generation BMP.  (*Id.* ¶¶ 22, 24.)

---

[1] The Court has previously described the facts of this case at length in a previous order. *See W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 139 F. Supp. 3d 976 (D. Minn. 2015).

The lead Plaintiffs in this case are several institutional investors:  West Virginia Pipe Trades Health & Welfare Fund, Union Asset Management Holding AG, and Employees' Retirement System of the State of Hawaii, all of which allege that they purchased Medtronic common stock and were damaged by the conduct alleged in the Complaint.  (*Id.* ¶¶ 43-45.)  They bring this action against Medtronic and several of its officers and employees, including:  William Hawkins, former Chair of the Board of Directors and Chief Executive Officer ("CEO"), (*id.* ¶ 47); Gary Ellis, Chief Financial Officer ("CFO"), (*id.* ¶ 48); Richard Kuntz, Chief Scientific, Clinical, and Regulatory Officer, (*id.* ¶ 49); Dr. Julie Bearcroft, Director of Technology Management in Medtronic's Biologics Marketing Department, (*id.* ¶ 50); Dr. Richard Treharne, Senior Vice President of Clinical and Regulatory Affairs, (*id.* ¶ 51); and Dr. Martin Yahiro, Medtronic Senior Director of Regulatory Affairs, (*id.* ¶ 52).  The Complaint also alleges violations by three consultants ("Consultant Defendants"):  Dr. Thomas Zdeblick, (*Id.* ¶ 53); Dr. Kenneth Burkus, (*id.* ¶ 54); and Dr. Scott Boden, (*Id.* ¶ 55).

Plaintiffs contend that Medtronic engaged in a scheme to manipulate the early clinical studies by omitting many of INFUSE's adverse events.  (*Id.* ¶¶ 162-65.)  Plaintiffs allege that early INFUSE clinical studies revealed safety risks that threatened Medtronic's goals for the product and, as a result, Medtronic "embarked on a scheme with physician investigators and authors to conceal the significant safety risks from the public and physician community."  (*Id.* ¶¶ 15, 163.)  They allege that Medtronic did so by "forg[ing] relationships, including financial relationships, with physician authors who published research articles in respected medical journals and knowingly concealed in

those original articles, or omitted altogether, known facts regarding INFUSE's adverse side effects observed in clinical trials," and that these research articles "overstated apparent disadvantages of alternate bone graft procedures . . . as opposed to treatment with INFUSE." (*Id.* ¶ 16.) Plaintiffs also allege that Medtronic "failed to disclose that Medtronic had paid millions of dollars to the same physician authors" and "heavily edited the articles and specifically excised true facts learned during clinical trials about the efficacy and side effects of INFUSE, which would have alerted the public and physicians using INFUSE about its harmful side effects and lack of clinical benefit." (*Id.* ¶ 17.)

On June 28, 2011, *The Spine Journal* released an issue devoted to concerns regarding INFUSE. (*Id.* ¶ 103; *see also* Decl. of Christopher M. Wood ("Wood Decl.") ¶ 54, Ex. 26, Apr. 7, 2015, Docket No. 103.) Plaintiffs contend that, "[t]aken as a whole, the June 28, 2011 issue of *The Spine Journal* began to inform the market, for the first time, that the research supporting the safety and efficacy of INFUSE was not reliable." (Compl. ¶ 103.) That same day, Medtronic filed its FY11 Form 10–K, which included a statement about *The Spine Journal* articles and "conceded that the articles would have an impact on future sales." (*Id.* ¶¶ 112.) Plaintiffs contend that these disclosures led to a drop in the value of Medtronic stock. (*Id.* ¶¶ 113-16.)

## II.    PROCEDURAL BACKGROUND

Plaintiffs allege that Medtronic and the Individual Defendants violated Section 10(b) of the Exchange Act by making false and misleading statements to investors (Count I) and by engaging in a scheme to pay physician authors to conceal adverse events

associated with INFUSE and AMPLIFY (Count II).  (*Id*. ¶¶ 157–65.)  Additionally, Plaintiffs allege that the Individual Defendants are liable under Section 20(a) of the Exchange Act as control persons of Medtronic (Count III).  (*Id*. ¶¶ 166-70.)

This is not the Individual Defendants' first effort to dismiss this case.  On September 14, 2014, the Court granted in part and denied in part Defendants' motions to dismiss.  *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950 (D. Minn. 2014).  The Court granted the Consultant Defendants' motion after concluding that the applicable date for the statute of repose is June 27, 2008.  *Id.* at 977-80.  However, Medtronic and the Individual Defendants did not move to dismiss based on the statute of repose, and their motion was granted in part and denied in part.  *Id.* at 980-84.

On September 30, 2015, the Court granted summary judgment against Plaintiffs on all remaining claims based on the statute of limitations.  *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 139 F. Supp. 3d 976 (D. Minn. 2015).  Defendants also argued that the statute of repose barred this action but the Court did not reach that issue. *Id.* at 988 n.11.

Plaintiffs appealed the dismissal of their claims of scheme liability and control-person liability.  *See W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384 (8th Cir. 2016).  Defendants sought to defend against reversal by arguing that Plaintiffs merely repackaged allegations of false statements into a scheme-liability claims in contradiction of Supreme Court precedent.  *Id.* at 388; *see Janus Capital Grp., Inc. v.*

*First Derivative Traders*, 564 U.S. 135 (2011); *Stoneridge Investment Partners, LLC, v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008).  The Eighth Circuit disagreed, stating:

> [Plaintiffs] allege conduct beyond mere misrepresentations or omissions actionable under Rule 10b-5(b).   [Plaintiffs'] scheme liability claim alleges that Medtronic shaped the content of medical journals by "pa[ying] physicians . . . to induce their complicity in concealing adverse events and side effects associated with the use of INFUSE and overstating the disadvantages of alternative bone graft procedures." Although the scheme liability claim also includes allegations that Medtronic edited language in the clinical studies that the physicians ultimately published, **the act of paying physicians to induce their complicity is the allegation at the heart of the scheme liability claim.**  Paying someone else to make a misrepresentation is not itself a misrepresentation.  Thus, [Plaintiffs] do not merely repackage allegations of misrepresentation as allegations of a scheme. *Janus* and *KV Pharmaceuticals* require some conduct other than a misrepresentation to support a scheme liability claim. They do not hold that the alleged scheme can never involve any misrepresentation in order for the scheme liability claim to survive.  *See, e.g.*, *In re Smith Barney*, 884 F. Supp. 2d at 161 (sustaining scheme liability claim where alleged conduct included but was not limited to misleadingly disclosing fees). Accordingly, because Medtronic's alleged deceptive conduct goes beyond mere misrepresentations or omissions, *Janus* does not bar [Plaintiffs'] scheme liability claim.

*W. Va. Pipe Trades*, 845 F.3d at 393 (emphasis added).  The Eighth Circuit reversed and remanded the case back to the Court.

The Individual Defendants again move for summary judgment.

**DISCUSSION**

I.      **STANDARD OF REVIEW AND APPLICABLE LAW**

      A.      **Standard of Review**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of a suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable factual inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show through the presentation of admissible evidence that the specific facts exist and create a genuine issue for trial.  *Anderson*, 477 U.S. at 256.  But "[w]here the moving party fails to satisfy its burden to show initially the absence of a genuine issue concerning any material fact, summary judgment must be denied even if no opposing evidentiary matter is presented."  *Foster v. Johns-Manville Sales Corp.*, 787 F.2d 390, 393 (8th Cir. 1996).

The statute of repose is an affirmative defense and, therefore, the Individual Defendants bear the burden of proving this defense at trial.  *Integrity Floorcovering, Inc. v. Broan-Nu Tone LLC*, 503 F. Supp. 2d 1136, 1139 (D. Minn. 2007).

> Where, as here, the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim.

*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *see also Simmons, Inc. v. Koronis Parts, Inc.*, No. 00-1984, 2001 WL 1095008, at *2 (D. Minn. Sept. 17, 2001).

### B.    Scheme Liability

Section 10(b) of the Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements Section 10(b).  *See Pub. Pension Fund Grp v. KV Pharm. Co.*, 679 F.3d 972, 980 (8th Cir. 2010). Rule 10b-5 makes it unlawful to (a) "employ any device, scheme, or artifice to defraud," (b) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5.

Claims brought under Rules 10b-5(a) and (c) are generally referred to as scheme-liability claims, and are distinct from claims under Rule 10b-5(b) because they are based on deceptive conduct rather than deceptive statements.  *See KV Pharm. Co.*, 679 F.3d at

986.   To establish scheme liability, a plaintiff must show that the defendant "(1) committed a deceptive or manipulative act (2) with *scienter*, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants' actions caused the plaintiffs' injuries." *In re Parmalat Secs. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006).

"[A] plaintiff cannot support a scheme liability claim by simply repackaging a fraudulent misrepresentation as a scheme to defraud.  Rather, a plaintiff must allege some deceptive act other than the fraudulent misrepresentation." *W. Va. Pipe Trades*, 845 F.3d at 392.  "[A] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *KV Pharm. Co.*, 679 F.3d at 987 (quoting *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011)).

### C.    Control-Person Liability

Under 15 U.S.C. § 78t(a), "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."  A control person is not liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *Id.*  To assert a claim of control liability, a plaintiff must establish (1) "that the defendant . . . 'actually participated in (*i.e.*, *exercised* control over)

the operations of the corporation in general," and (2) the defendant "possessed the power to control the specific transaction or activity upon which the primary violation is predicated," although he or she "need not prove that this later power was exercised." *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985) (quoting with approval the test used by the district court in *Metge v. Baehler*, 577 F. Supp. 810, 814 (S.D. Iowa 1984)). Whether an individual is a control person is "an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Cummings v. Paramount Partners, LP*, 715 F. Supp. 2d 880, 907 (D. Minn. 2010).

### D.   Statute of Repose

Claims brought under Section 10(b) of the Exchange Act may not be brought later than five years after the alleged violation.   28 U.S.C. § 1658(b)(2).   The Court has concluded that the relevant date for the statute of repose is June 27, 2008.   *W. Va. Pipe Trades*, 57 F. Supp. 3d at 978.   Therefore, for Plaintiffs to maintain their claims against the Individual Defendants, the Individual Defendants must have committed a deceptive act in furtherance of Medtronic's alleged scheme after June 27, 2008.

The parties dispute the reach of the statute of repose.   Plaintiffs argue that they should be able to hold the Individual Defendants accountable for the entire course of conduct – even for acts that occurred before June 27, 2008 – under a continuing fraudulent scheme theory.   According to Plaintiffs' theory, if an Individual Defendant committed **any** act in furtherance of the scheme after June 27, 2008, Plaintiffs may

maintain a scheme-liability claim against that Individual Defendant for the **entire** course of conduct.

Plaintiffs are correct that "[s]ome district courts . . . have applied [a continuing fraudulent scheme theory] to blunt the statute of repose where a plaintiff alleges a series of misrepresentation[s] or omissions, some inside and some outside the repose period." *Howe v. Shchekin*, 238 F. Supp. 3d 1046, 1050 (N.D. Ill. 2017). But a majority of courts have rejected the continuing fraudulent scheme theory with respect to Section 10(b) claims. *See id.*; *see also Carlucci v. Han*, 886 F. Supp. 2d 497, 514 & n.9 (E.D. Va. 2012) (collecting cases).

Courts rejecting this theory have grounded their reasoning in Supreme Court statements suggesting that the nature of the statute of repose is "unqualified." *Carlucci*, 886 F. Supp. 2d at 515 (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 650 (2010)). According to the Supreme Court, in contrast to statutes of limitations, statutes of repose "are enacted to give more explicit and certain protection to defendants," representing a "legislative judgment that a defendant should be free from liability after the legislatively determined period of time." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Secs., Inc.*, 137 S. Ct. 2042, 2049 (2017) (quoting *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2183 (2014)). "The purpose and effect of a statute of repose . . . is to override customary tolling rules arising from the equitable powers of courts. . . . The unqualified nature of that determination supersedes the courts' residual authority and forecloses the extension of the statutory period based on equitable principles." *Id.* at 2051.

As other courts have recognized, allowing Plaintiffs to maintain claims against Defendants for violations that occurred before June 27, 2007, would read a form of equitable tolling into the statute in contradiction of its plain language. *Howe*, 238 F. Supp. 3d at 1050; *see also Carlucci*, 886 F. Supp. 2d at 515; *Wolfe v. Bellos*, No. 3:11-2015, 2012 WL 652090, at *6 (N.D. Tex. Feb. 28, 2002). The statute specifies that actions under Section 10(b) "may be brought not later than . . . 5 years after **such violation**." 28 U.S.C. § 1658(b)(2) (emphasis added). "Violation" means "[a]n infraction or **breach of the law**." *Black's Law Dictionary* 1800 (10th ed. 2014) (emphasis added). The plain and ordinary meaning requires the violation of Section 10(b) – the independently actionable breach of the Exchange Act – to have occurred within the repose period. The plain language does not permit a plaintiff to toll the repose period by producing evidence of non-violating acts that occurred outside the repose period even if they are sufficiently connected to the scheme to create a chain to the original violating act. *See Anz Secs., Inc.*, 137 S. Ct. at 2051.

In order to be liable for scheme liability under Rule 10b-5(a) and (c), the Individual Defendants must have committed an independently actionable violation of Rule 10b-5(a) and (c) after June 27, 2008.

## II.    INDIVIDUAL DEFENDANTS

The Individual Defendants move for summary judgment, arguing (1) they committed no independently actionable violation of Rule 10b-5(a) and (c) within the repose period and (2) they are not control persons under 15 U.S.C. § 78t(a).

As a threshold matter, the Court must explain the scope of its inquiry.  The crux of the alleged scheme is that Medtronic paid physician authors to conceal adverse events and side effects associated with the use of INFUSE and to overstate the disadvantages of alternative graft procedures.  *W. Va. Pipe Trades*, 845 F.3d at 393.  To be liable, the Individual Defendants must have committed some deceptive act in furtherance of this alleged scheme within the repose period.  *See* 28 U.S.C. § 1658(b)(2).  Plaintiffs cannot maintain their scheme-liability claims by simply producing evidence of **any** misstatement or deceptive act related to INFUSE or AMPLIFY if the act is immaterial to the alleged scheme to pay physician authors to conceal adverse events related to INFUSE.

Plaintiffs have produced evidence of deceptive acts that are not related to the alleged scheme.  First, Plaintiffs argue that Hawkins, Ellis, Kuntz, and Bearcroft continued to promote INFUSE's safety and efficacy in an effort to convince the Center for Medicaid and Medicare Services ("CMS") to continue Medicare coverage for the use of INFUSE.  (Second Mem. in Opp. to Summ. J. ("Opp. II") at 31-32, Nov. 15, 2017, Docket No. 433.)  Second, Plaintiffs argue that Hawkins and Ellis actively concealed from shareholders the FDA's refusal to allow Medtronic to market AMPLIFY.  (Opp. II at 32-33.)  Third and finally, Plaintiffs argue that Dr. Treharne prepared Dr. Yahiro for meetings with the FDA.  (First Mem. in Opp. to Summ. J ("Opp. I") at 22-23, May 19, 2017, Docket No. 278.)  These acts may have been deceptive, and they do relate to Medtronic's efforts to market INFUSE and AMPLIFY.  However, they do not relate to the relatively narrow scheme – paying physician authors to publish false and misleading journal articles – that constitutes the alleged scheme in this case.  The Court therefore

-13-

will not consider these or other irrelevant deceptive acts in deciding whether an Individual Defendant committed acts in furtherance of the alleged scheme during the repose period.

### A.    Dr. Richard Treharne

Dr. Treharne is a retired employee of Medtronic, who now performs consulting work for the company.  (Decl. of Richard W. Treharne ("Treharne Decl.") at 1, Mar. 17, 2017, Docket No. 96; Sealed Ex. 37 ("Treharne Agreement") at 2, Nov. 15, 2017, Docket No. 442.)  During his employment, Dr. Treharne served as Senior Vice President of Clinical and Regulatory Affairs.  (Compl. ¶ 51; *see* Sealed Ex. 63 ("Treharne Dep.") at 76:3-10, Nov. 15, 2017, Docket No. 465.)  The Court must decide whether there is a genuine issue of material fact with respect to (1) whether Dr. Treharne committed a deceptive act in furtherance of the alleged scheme during the repose period and (2) whether Dr. Treharne exercised control over Medtronic's operations during the repose period.  The Court will grant the Individual Defendants' motion for summary judgment with respect to both claims brought against Dr. Treharne.

### 1.    Scheme Liability

The Court must decide whether there is a genuine issue of material fact with respect to whether Dr. Richard Treharne committed a deceptive act in furtherance of the alleged scheme during the repose period.

Dr. Treharne submitted an affidavit stating that he "retired from Medtronic on August 5, 2006," and "[s]ince [his] retirement from Medtronic in 2006, [he has] not had

any authority over or responsibility for any aspect of Medtronic's business."  (Treharne

Decl. at 1.)   But Plaintiffs have produced a "Personal Services Agreement" between

Medtronic and Dr. Treharne showing that he continued to provide consulting services

after his retirement until August 6, 2009.  (Treharne Agreement at 2, 7.)  The Court must

therefore consider whether any of Dr. Treharne's consulting services conducted from

June 27, 2008, to August 6, 2009, concerned the decision to pay physician authors in

relation to the alleged scheme.

The Complaint only references acts committed by Dr. Treharne prior to June 27,

2008, and Dr. Treharne testified that he has not performed any consulting related to the

publication of articles about INFUSE since his retirement in 2006.  (Treharne Dep. at

216:5-15; *see* Compl.  ¶¶ 71, 87(i), 129; Treharne Dep. at 216:5-15.)  Evidence submitted

to the Court shows that Dr. Treharne provided consulting in relation to (1) preparing Dr.

Yahiro for meetings with the FDA and (2) assisting Medtronic with a qui tam action

related to INFUSE.

First, Dr. Treharne testified that the majority of his work as a consultant dealt with

preparing Medtronic for FDA panel meetings related to AMPLIFY by participating in

mock panel meetings.  (*Id.* at 80:17-84:20.)  The mock panel meetings did not require the

submission of clinical trials, and Dr. Treharne testified that he is unaware of what

Medtronic submitted to the FDA.  (*Id.* at 94:10-95:13.)  Other evidence shows that Dr.

Treharne helped Dr. Yahiro prepare for meetings with the FDA.  (Sealed Ex. 19, May 19,

2017, Docket No. 292; Sealed Ex. 20, May 19, 2017, Docket No. 293; Sealed Ex. 21,

May 19, 2017, Docket No. 294.)  Moreover, most of the evidence is dated before June 27,

2008.  The only email exchange that suggests that Dr. Treharne may have been involved during the repose period is a forwarded email to Dr. Treharne about a FDA public-health notice.  (Sealed Ex. 21 at 3.)  Although Dr. Treharne prepared Medtronic to appear before the FDA on various AMPLIFY-related issues, the Court finds that the evidence does not suggest that this consulting work involved the decision to pay physician authors to publish false information about Medtronic's spinal products.

Second, Dr. Treharne assisted Medtronic in its defense of a qui tam action related to off-label use of INFUSE.  Dr. Treharne's testimony suggests that he was deposed in that case.  (Treharne Dep. at 73:12-74:16.)  The only other evidence of Dr. Treharne's participation in the qui tam action is an email in which Dr. Treharne sent someone a copy of a document that he believed "the other side [was] asking for."  (Sealed Ex. 23 at 2, May 19, 2017, Docket No. 296.)  The Court finds that serving as a witness in a qui tam action is not a deceptive act related to the alleged scheme.

Viewing the evidence in the light most favorable to the Plaintiffs, the Individual Defendants have satisfied their burden of demonstrating that there is no genuine issue of material fact that Dr. Treharne did not commit a deceptive act in furtherance of the alleged scheme during the repose period.  *See* 28 U.S.C. § 1658(b)(2).  Accordingly, the Court will grant the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Dr. Treharne and will dismiss Count II with respect to him.

### 2.      Control Person Liability

The Court must decide whether there is a genuine issue of material fact with respect to whether Dr. Treharne acted as a control person of Medtronic during the repose period.

To be liable as a control person, Dr. Treharne must have controlled the general operations of Medtronic during the repose period. *See Metge*, 762 F.2d at 631. During the repose period, Dr. Treharne merely served as a consultant. The consulting agreement specifies that Dr. Treharne will "provide regulatory and clinical consulting services" to Medtronic, and does not suggest that Treharne had any role in managing Medtronic. (Treharne Agreement at 2.) In fact, the agreement specifies that Dr. Treharne is an independent contractor and "may not incur any liability on [Medtronic's] behalf nor bind [Medtronic] to any contractual or payment obligation without the prior written consent of [Medtronic]." (*Id.* at 4-5.) The Court finds that the evidence firmly establishes that Dr. Treharne did not exercise control over the operations of Medtronic after his retirement.

Additionally, to be liable as a control person, Dr. Treharne must have possessed the power to control Medtronic's decision to pay the physician authors, even if he did not exercise such authority. *See Metge*, 762 F.2d at 631. Again, Dr. Treharne's consulting agreement establishes that he did not have authority to bind Medtronic to any sort of agreement with the physician authors. As discussed above, the Court finds that there is no evidence that Dr. Treharne participated in the alleged scheme during the repose period, much less exercised any amount of control over the scheme.

Accordingly, the Court will grant the Individual Defendants' motion for summary judgment with respect to the control-person liability claim brought against Dr. Treharne and will dismiss Count II with respect to him.

### B.      Dr. Martin Yahiro

Dr. Yahiro worked at Medtronic from 2003 to 2011 as Senior Director of Clinical and Regulatory Affairs.  (Sealed Ex. 2 ("Yahiro Dep.") at 21:12-15, 27:2-11, Nov. 30, 2017, Docket No. 477; Compl. ¶ 52.)  During this time, he was tasked with managing various submissions to the FDA.  (*Id.* at 27:21-30:5.)  Dr. Yahiro worked to obtain FDA approval to expand INFUSE's approved uses and helped design clinical trials to further this goal.  (*Id.* at 32:18-24, 35:6-23.)  The Court must decide whether there is a genuine issue of material fact with respect to (1) whether Dr. Yahiro committed a deceptive act in furtherance of the alleged scheme during the repose period and (2) whether Dr. Yahiro exercised control over Medtronic's operations during the repose period.  The Court will deny the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Dr. Yahiro, but will grant the motion with respect to the control-person liability claim brought against him.

### 1.      Scheme Liability

The Court must decide whether there is a genuine issue of material fact with respect to whether Dr. Martin Yahiro committed a deceptive act in furtherance of the alleged scheme during the repose period.

Evidence submitted demonstrates that Dr. Yahiro continued to design clinical trials for INFUSE during the repose period.  At his deposition, Dr. Yahiro testified about an "Infuse Bone Graft TLIF Pivotal Study Design Pre-IDE Meeting" that purportedly occurred on June 29, 2009, which he attended.  (Yahiro Dep. at 194:3-7, 195:10-19.)  A PowerPoint slide from that meeting states, "FDA Comments: FDA is extremely concerned, concerned that this study design raises concerns about bias and likely differences in both the surgeons and patients who will end up in each treatment arm." (*Id.* at 196:6-11.)  Additionally, a PowerPoint slide prepared by McKinsey & Company – who Medtronic retained to consult with on strategies related to INFUSE – lists Dr. Yahiro on both the "TLIF trial design" and "Clinical strategy" teams.  (Sealed Ex. 18 at 8, May 19, 2017, Docket No. 291; Yahiro Dep. at 207:8-11.)  Medtronic hoped to design studies that would demonstrate (1) "BMP-2 is safe and efficacious relative to alternative therapies for a given indication,"  (2) "[p]atient care is improved in an overall more cost effective manner, and (3) "BMP-2 is safe for patients, easy to use, improves outcomes and limits liability."  (Sealed Ex. 18 at 23.)

The Court finds that Dr. Yahiro's participation in these meetings suggests – as is concomitant with his job description – that Dr. Yahiro was involved in designing trials to seek expansion of INFUSE's uses during the repose period.  Admittedly, this evidence does not show precisely how involved Dr. Yahiro was in designing these trials, whether he was engaged in selecting physician authors for these studies, and/or whether he asked physician authors to conceal certain results from the clinical trials.  At trial, Plaintiffs would need to produce significantly more evidence about Dr. Yahiro's involvement in

the alleged scheme.   Yet, on this motion for summary judgment, the Individual Defendants have the burden of proving why they are entitled to judgment as a matter of law on their statute-of-repose defense.  *See Integrity Floorcovering, Inc.*, 503 F. Supp. 2d at 1139.  They have not "demonstrate[d] why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim."  *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601.

The Court therefore finds that there is a genuine issue of material fact regarding whether Dr. Yahiro committed a deceptive act in furtherance of the alleged scheme while designing clinical trials for INFUSE during the repose period.  Accordingly, the Court will deny the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Dr. Yahiro.

### 2.      Control-Person Liability

The Court must decide whether there is a genuine issue of material fact with respect to whether Dr. Yahiro acted as a control person of Medtronic during the repose period.

To be liable as a control person, Dr. Yahiro must have controlled the general operations of Medtronic during the repose period. *See Metge*, 762 F.2d at 631.  As Senior Director of Clinical and Regulatory Affairs, Dr. Yahiro's work responsibilities involved preparing regulatory submissions to the FDA and designing clinical studies.  (Yahiro Dep. at 27:21-28:16.)  Dr. Yahiro was not even the most executive manager within the managerial hierarchy of Clinical Affairs.  (*Id.* at 30:6-31:9.)  The Court finds that neither

his duties nor his position even remotely suggests that Dr. Yahiro exercised general control over the operations of Medtronic.  *See Metge*, 762 F.2d at 631.  The Court concludes that the Individual Defendants have satisfied their burden of demonstrating that there is no genuine issue of material fact that Dr. Yahiro did not act as a control person of Medtronic during the repose period.

Additionally, to be liable as a control person, Dr. Yahiro must have possessed the power to control Medtronic's decision to pay the physician authors, even if he did not exercise such authority.  *See Metge*, 762 F.2d at 631.  Sufficient evidence suggests that Dr. Yahiro might have been **involved** in the decision to pay physician authors.  However, the Court is not persuaded that the evidence creates a genuine issue of fact that Dr. Yahiro had the authority to **control** the decision to pay the physician authors.  Control-person liability necessitates much more than mere the participation in a scheme; it requires control over the decision to engage in a fraudulent scheme and the ability to prevent the company from making that decision.  *See id.*

Accordingly, the Court will grant the Individual Defendants' motion for summary judgment with respect to the control-person claim brought against Dr. Yahiro and will dismiss Count III with respect to him.

### C.      Richard Kuntz

Richard Kuntz served as Medtronic's Senior Vice President and Chief Scientific Clinical and Regulatory Officer from August 2009 onward.  (Compl. ¶ 49.)  The Court must decide whether there is a genuine issue of material fact with respect to (1) whether

Kuntz committed a deceptive act in furtherance of the alleged scheme during the repose period and (2) whether Kuntz exercised control over Medtronic's operations during the repose period.   The Court will grant the Individual Defendants' motion for summary judgment with respect to both claims brought against Kuntz.

### 1.    Scheme Liability

The Court must decide whether there is a genuine issue of material fact with respect to whether Richard Kuntz committed a deceptive act in furtherance of the alleged scheme during the repose period.

The Complaint makes no mention of any act committed by Kuntz but simply lists his position and makes conclusory allegations against him.   (Compl. ¶¶ 1, 49, 168.) Submitted evidence details only one act committed by Kuntz during the repose period. Plaintiffs have submitted evidence that Kuntz spoke at a meeting with Centers for Medicare and Medicaid Services ("CMS") regarding "the clinical benefits and harms of on-label and off-label use of BMPs."  (Sealed Ex. 67 at 143, Nov. 15, 2017, Docket No. 468; Sealed Ex. 59, Nov. 15, 2017, Docket No. 461.)  As previously discussed, the Court finds that Kuntz's potentially false and misleading statements to CMS are insufficient to maintain a claim of scheme liability against him because these acts – although perhaps deceptive – fall outside the scope of this case.  *See W. Va. Pipe Trades*, 845 F.3d at 393.

Viewing the evidence in the light most favorable to the Plaintiffs, the Individual Defendants have satisfied their burden of demonstrating that there is no genuine issue of material fact that Kuntz did not commit a deceptive act in furtherance of the alleged

scheme during the repose period.  *See* 28 U.S.C. § 1658(b)(2).  Accordingly, the Court will grant the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Kuntz and will dismiss Count II with respect to him.

### 2.  Control-Person Liability

The Court must also decide whether there is a genuine issue of material fact with respect to whether Kuntz acted as a control person of Medtronic during the repose period.

To be liable as a control person, Kuntz must have controlled the general operations of Medtronic during the repose period.  *See Metge*, 762 F.2d at 631.  The Individual Defendants concede in their memorandum that Kuntz was one of the "most senior executives of the company."  (Mem. in Supp. of Mot. Summ. J. at 8-9, May 5, 2017, Docket No. 261.)  In their second reply brief, Defendants now assert that "[t]here is zero evidence" that Kuntz "exercised control over the 'general operations' of Medtronic." (Def.'s Supplemental Rep. Br. ("Rep. II") at 33, Nov. 29, 2017, Docket No. 474.) Indeed, Plaintiffs have produced no evidence – not even so much as a job description – from which to tease out Kuntz's role in the organization.  His title alone is insufficient evidence.  Plaintiffs may not rest on mere allegations that Kuntz had the ability to control Medtronic's decision to hire certain physician authors or ask them to conceal certain adverse events.  *See Anderson*, 477 U.S. at 256.  The Court finds that there is no genuine issue of fact with respect to whether Kuntz controlled the general operations of Medtronic.

Additionally, there is no evidence that Dr. Kuntz possessed the power to control Medtronic's decision to pay the physician authors.  *See Metge*, 762 F.2d at 631.

Accordingly, the Court will grant the Individual Defendants' motion for summary judgment with respect to the control-person liability claim brought against Kuntz and will dismiss Count III with respect to him.

### D.    William Hawkins

Williams Hawkins was CEO and Chairman of the Board during the repose period. (Sealed Ex. 6 ("Hawkins Dep.") at 17:23-18:7, Nov. 30, 2017, Docket No. 481.)   He retired from Medtronic in June 2011.  (*Id.*)   The Court must decide whether there is a genuine issue of material fact with respect to (1) whether Hawkins committed a deceptive act in furtherance of the alleged scheme during the repose period and (2) whether Hawkins exercised control over Medtronic's operations during the repose period.  The Court will grant the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Hawkins, but will deny the motion with respect to the control-person liability claim brought against him.

#### 1.    Scheme Liability

The Court must decide whether there is a genuine issue of material fact with respect to whether William Hawkins committed a deceptive act in furtherance of the alleged scheme during the repose period.

Plaintiffs focus on Hawkins's approval of an $18 million payout to Dr. Scott Boden for consulting services.  According to Hawkins, this payment was strictly for

intellectual property acquired from Dr. Boden and was not related to Dr. Boden's journal articles.  (*Id.* at 193:8-15.)   Dr. Boden's deposition and emails establish that this intellectual property related to patents for which he received royalties from Medtronic. (Sealed Ex. 9 at 3, Nov. 30, 2017, Docket No. 484; Sealed Ex. 5 at 70:12-23, Nov. 30, 2017, Docket No. 480.)  No contrary evidence suggests that this payment was made in an effort to conceal the alleged scheme.  The Court finds that the evidence submitted establishes that this payment was for the rights to patents owned by Dr. Boden and not for Dr. Boden's work as a physician consultant.  The Court therefore concludes that Hawkins's approval of this payment does not constitute a deceptive act committed in furtherance of the alleged scheme.

Plaintiffs also point to a "letter of the day" penned by Hawkins in the *Star Tribune*, which argued, "The suggestion that doctors are paid to use our products is simply untrue." (Sealed Ex. 71 at 241, Nov. 15, 2017, Docket No. 468.)  This letter does not address allegations that Medtronic paid physician authors to write fraudulent articles. Instead, this article addresses allegations that Medtronic paid physicians to treat patients with specific Medtronic products.   While Hawkins's statements might have been deceptive, the Court finds that these statements were not made in furtherance of the scheme alleged in this case.  Moreover, the Court is not certain – without further evidence of other acts – that this allegedly false statement could be used to maintain a claim of scheme liability against Hawkins.  *See W. Va. Pipe Trades*, 845 F.3d at 393. The Court therefore concludes that Hawkins's writing of the letter does not constitute a deceptive act committed in furtherance of the scheme.

Viewing the evidence in the light most favorable to the Plaintiffs, the Individual Defendants have satisfied their burden of demonstrating that there is no genuine issue of material fact that Hawkins did not commit a deceptive act in furtherance of the alleged scheme during the repose period. *See* 28 U.S.C. § 1658(b)(2). Accordingly, the Court will grant the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Hawkins and will dismiss Count II with respect to him.

### 2.    Control-Person Liability

The Court must also decide whether there is a genuine issue of material fact with respect to whether Hawkins acted as a control person of Medtronic during the repose period.

The Individual Defendants concede that Hawkins exercised control over Medtronic's general operations as CEO. (Rep. II at 34); *accord Metge*, 762 F.2d at 631. However, the Individual Defendants argue that Hawkins did not have the power to control the Spine Division's decision to pay physician authors because he did not have knowledge of the Spine Division's contracts with and payments to consulting or inventing physicians. *See Metge*, 762 F.2d at 631. In his testimony, Hawkins flexed his plenary power over Medtronic, stating that he was "responsible for the operations of the company" and "[t]he buck stops with me." (Hawkins Dep. at 19:12-25.) Hawkins testified that while he was CEO, Medtronic paid physicians to conduct clinical studies, including studies researching BMP. (*Id.* at 31:15-33:6.) Hawkins testified that

Medtronic did not disclose its payments to physician authors.   (*Id.* at 105:14-106:4.) Therefore, there Court concludes that there is a genuine issue of material fact with respect to whether Hawkins possessed the power "to control the specific transaction or activity" upon which the alleged scheme is based.  *Metge*, 762 F.2d at 631.

Accordingly, the Court will deny the Individual Defendants' motion for summary judgment with respect to control-liability claims brought against Hawkins.

### E.     Gary Ellis

Gary Ellis was CFO of Medtronic during the repose period.  (Sealed Ex. 51 ("Ellis Dep.") at 13:19-14:14, Nov. 15, 2017, Docket No. 453.)  The Court must decide whether there is a genuine issue of material fact with respect to (1) whether Ellis committed a deceptive act in furtherance of the alleged scheme during the repose period and (2) whether Ellis exercised control over Medtronic's operations during the repose period. The Court will grant the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Ellis, but will deny the motion with respect to the control-person liability claim brought against him.

### 1.  Scheme Liability

The same allegations, arguments, and evidence have been brought against Hawkins and Ellis.  (*See* Opp. II at 29-33.)  Accordingly, the Court concludes that its analysis with respect to Ellis is the same as its analysis of whether Hawkins committed a deceptive act in furtherance of the alleged scheme during the repose period.  Viewing the evidence in the light most favorable to the Plaintiffs, the Individual Defendants have

satisfied their burden of demonstrating that there is no genuine issue of material fact that Ellis did not commit a deceptive act in furtherance of the alleged scheme during the repose period.  *See* 28 U.S.C. § 1658(b)(2).  Accordingly, the Court will grant the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Ellis and will dismiss Count II with respect to him.

### 2.  Control-Person Liability

The Court must also decide whether there is a genuine issue of material fact with respect to whether Ellis acted as a control person of Medtronic during the repose period.

The Individual Defendants concede that there is evidence that Ellis exercised control over Medtronic's general operations as CFO.  (Rep. II at 29); *accord Metge*, 762 F.2d at 631.  However, the Individual Defendants argue that Ellis did not have the power to control the Spine Division's decision to pay physician authors because he did not have knowledge of the Spine Division's contracts with those physicians.  *See Metge*, 762 F.2d at 631.  All of Medtronic's finance, accounting, treasury, tax, investor relations, and internal audit groups reported to Ellis as CFO.  (Ellis Dep. at 14:15-23.)  Ellis testified that he was aware that (1) Medtronic paid physicians for consulting agreements and (2) Medtronic employees provided input to these physicians about what to include in their published articles.  (*Id.* at 16:2-13; 19:16-20:17.)  Moreover, Ellis testified that he knew of several of the physician consultants who worked with the Spine Division.  (*Id.* at 17:15-19:4.)  Ellis was included on a December 15, 2010, email from a journalist seeking disclosure of payments to physician authors, and Ellis testified that Medtronic decided

not to disclose these payments.  (*Id.* at 90:12-94:8.)  Ellis's testimony suggests that he had at least some awareness about the Spine Division's agreements with physician authors.  The Court concludes that there is a genuine issue of material fact with respect to whether Ellis possessed the power "to control the specific transaction or activity" upon which the alleged scheme is based.  *Metge*, 762 F.2d at 631.

Accordingly, the Court will deny the Individual Defendants' motion for summary judgment with respect to control-liability claims brought against Ellis.

### F.    Dr. Julie Bearcroft

Dr. Julie Bearcroft served as Publication Coordinator for Medtronic's spinal division and "would be the contact person for the physician authors, and [] would work with a broad set of experts from various departments to address their questions."  (Sealed Ex. 54 ("Bearcroft Dep.") at 89:10-15, Nov. 15, 2017, Docket No. 456.)  The Court must decide whether there is a genuine issue of material fact with respect to (1) whether Dr. Bearcroft committed a deceptive act in furtherance of the alleged scheme during the repose period and (2) whether Dr. Bearcroft exercised control over Medtronic's operations during the repose period.  The Court will deny the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Dr. Bearcroft, but will grant the motion with respect to the control-person liability claim against her.

### 1.  Scheme Liability

As Publication Coordinator, Dr. Bearcroft worked with Dr. Burkus on the publication of his articles related to BMP.  A "Consulting Services Activity Report" from October 2008, listed Neil Beals as Dr. Burkus's contact for "services" related to a manuscript on BMP.  (Sealed Ex. 16 at 6-8, May 19, 2017, Docket No. 289.)  When asked to confirm these services, Beals responded, "I believe that these are appropriate but Julie Bearcroft is really primary point of contact on these activities and she would be in a better position to confirm."  (*Id.* at 20.)  Neil Beals was Dr. Bearcroft's direct supervisor at the time of this email.  (Bearcroft Dep. at 27:15-24.)

Other reports list Dr. Bearcroft explicitly.  Dr. Burkus's July 2008 report listed Dr. Bearcroft as the contact for "Work on JBJS LT CAGE Long Term paper" and "Work on JBJS Posterolateral BMP paper."  (Sealed Ex. 49 at 71, Nov. 15, 2017, Docket No. 451.)  Dr. Burkus's January 2009 report listed Dr. Bearcroft as the contact for "Work on Mastergraft BMP JBJS Manuscript," "Amplify 2-Level Study Investigator's Meeting," "Work on abstract 'Multi-level Instrumented Posterolateral Fusions using A New rhBMP-2 Formulation and Compression Resistant Matrix," and "Work on BMP Antibody Formation manuscript."  (*Id.* at 92-94.)  Dr. Burkus's April 2009 report listed Dr. Bearcroft as the contact for "Work on letter to the editor re: 'Use of rhBMP-2 in Combination with Structural Cortical Allografts: Clinical and Radiographic Outcomes in Anterior Lumbar Spinal Surgery" and "JBJS galley proofs on BMP MasterGraft manuscript."  (*Id.* at 98, 102.)  The Court finds that this evidence demonstrates that Dr.

Bearcroft was involved in approving payments for publications written by Dr. Burkus about BMP within the repose period.

Dr. Bearcroft testified that she was periodically "asked to review a consulting report to verify or not whether an activity took place" but "did not approve the payment." (Bearcroft Dep. 54 at 294:14-23.)  Dr. Bearcroft testified, "My role was just to verify whether an activity took place.  I didn't make a judgment as far as payment was concerned."  (*Id.* at 301:20-24.)  The Individual Defendants rely on the fact that approval of Dr. Burkus's activities took place cannot equate to approval of payment.  The Court is unpersuaded.  Other evidence suggests that these activities related to concealing adverse events in forthcoming studies.  To the extent that the Individual Defendants may be correct that the two should not be equated, that is a question of material fact not suitable for resolution at summary judgment.

The Individual Defendants argue that Dr. Burkus's studies published within the repose period are not deceptive.  But *The Spine Journal* casts doubts on the truthfulness of Dr. Burkus's studies.  One article in *The Spine Journal* states, "The FDA data reports more complications than either the 2003 or 2009 publication by Burkus et al."  (Sealed Ex. 66 at 31, Nov. 15, 2017, Docket No. 468 (footnotes omitted).)  The article notes that Dr. Burkus's 2009 study did not report a higher rate of retrograde ejaculation compared to other studies.  (*Id.*)  The article also mentions Dr. Burkus's Letter to the Editor, stating that Dr. Burkus "denied any potential association of this complication [retrograde ejaculation] with the use of rhBMP-2."  (*Id.*)  *The Spine Journal* article concluded that "retrospective review of complications and adverse events as reported in FDA and other

documents suggests the true risk to patients receiving rhBMP-2 is conservatively 10 to 50 times the original estimates calculated from industry-sponsored publications." (*Id.* at 40.) At a minimum, *The Spine Journal* called into question the legitimacy of Dr. Burkus's 2009 study and could lead a reasonable jury to conclude that these studies were the product of the alleged scheme to conceal adverse events associated with Medtronic's spine products.

The Court therefore finds that there is a genuine issue of material fact regarding whether Dr. Bearcroft committed a deceptive act in furtherance of the alleged scheme while working with physician consultants.  Accordingly, the Court will deny the Individual Defendants' motion for summary judgment with respect to the scheme-liability claim brought against Dr. Bearcroft.

### 2.  Control-Person Liability

The Court must also decide whether there is a genuine issue of material fact with respect to whether Dr. Bearcroft acted as a control person of Medtronic during the repose period.

To be liable as a control person, Dr. Bearcroft must have controlled the general operations of Medtronic during the repose period. *See Metge*, 762 F.2d at 631.  Dr. Bearcroft was an employee within the Medtronic's spine division, and was continuously managed by higher-level management within this group.  (Bearcroft Dep. at 26:23-29:16.)  The Court finds that there is no evidence to suggest that Dr. Bearcroft exercised control over the general operations of Medtronic.

Accordingly, the Court will grant the Individual Defendants' motion for summary judgment with respect to the control-person claim brought against Dr. Bearcroft and will dismiss Count III against her.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Renewed Motion for Summary Judgment as to Individual Defendants [Docket No. 259] is **GRANTED in PART and DENIED in PART** as follows:

1.     Summary Judgment is **GRANTED** with respect to all claims brought against Richard W. Treharne.  The Court will **DISMISS** Count II and Count III with respect to Treharne **with prejudice**.

2.     Summary Judgment is **DENIED** with respect to the scheme-liability claim brought against Martin Yahiro.  Summary Judgment is **GRANTED** with respect to the control-personal liability claim brought against Martin Yahiro.  The Court will **DISMISS** Count III with respect to Yahiro **with prejudice**.

3.     Summary Judgment is **GRANTED** with respect to all claims brought against Richard E. Kuntz.  The Court will **DISMISS** Count II and Count III with respect to Kuntz **with prejudice**.

4.     Summary Judgment is **GRANTED** with respect to the scheme-liability claim brought against William A. Hawkins.  The Court will **DISMISS** Count II with

respect to Hawkins **with prejudice**.  Summary Judgment is **DENIED** with respect to the control-person liability claim brought against William A. Hawkins.

5.     Summary Judgment is **GRANTED** with respect to the scheme-liability claim brought against Gary L. Ellis.  The Court will **DISMISS** Count II with respect to Hawkins **with prejudice**.  Summary Judgment is **DENIED** with respect to the control-person liability claim brought against Gary L. Ellis.

6.     Summary Judgment is **DENIED** with respect to the scheme-liability claim brought against Julie Bearcroft.  Summary Judgment is **GRANTED** with respect to the control-person liability claim brought against Julie Bearcroft.  The Court will **DISMISS** Count III with respect to Bearcroft **with prejudice**.


DATED: March 2, 2018                          _____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                                   Chief Judge
                                                         United States District Court